LÁZARO CONCEPCIÓN GUZMÁN ET AL., demandantes y recurrentes, *v.* LA AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, demandada y recurrida.

*Número:* 189     *Resuelto:* 7 de junio de 1965

*R. V. Pérez Marchand,* abogado de los recurrentes; *José Antonio Arabía, Juan F. Doval* y *Antonio S. Negrón García,* abogados de la recurrida.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente Accidental de Sala y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

Se plantea si es compensable el estado mental de reacción de conversión del recurrente, Lázaro Concepción Guzmán, estado a que advino luego de sufrir un gran susto provocado por un accidente debido a la negligencia de la recurrida, Autoridad de las Fuentes Fluviales de Puerto Rico.

Veamos, en primer lugar, las siguientes conclusiones de hecho del tribunal de instancia:

1. "Que el día 21 de enero de 1957 en las inmediaciones del lugar donde ellos [los recurrentes] residen, se quebró uno de los postes que sostenían líneas eléctricas de alta tensión cruzándose los alambres y produciendo una *explosión de gran estrépito.*" (Subrayado nuestro.)

2. "Que al ocurrir el estruendo el demandante Lázaro Concepción Guzmán, estaba almorzando en compañía de su señor padre, de su esposa y de sus hijos, quienes sobrecogidos de miedo, al producirse otra explosión simultáneamente dentro del hogar, que soltaba chispas se apresuraron a salir de la casa corriendo para un matojal en campo abierto . . ."

3. "Que después de algunos minutos de espera, el demandante acompañado de su padre, regresó a la casa para ver qué podía hacer en bien de su propiedad y al llegar a la misma se sintió mareado con frío y calor al mismo tiempo como si estuviese enfermo del estómago, deseando devolver pero sin poder hacerlo, perdiendo de pronto el conocimiento; que al recobrarlo más tarde, se encontró recluido en la Clínica Dr. Maldonado Sierra . . ."

4. "Que en dicho hospital se le hizo provisionalmente un diagnóstico de estado de ansiedad y astenia neurocirculatoria; más tarde se llegó a la conclusión de que padecía de una *reacción de conversión,* siendo su caso uno mental, pues físicamente no sufría de lesión patológica alguna." (Subrayado nuestro.)

. . . . . . . . .

5 "Que ha sido tratado por varios médicos llegando a la conclusión que es de una personalidad histérica formada lentamente de lo que se hereda, más lo que se adquiere en la vida y con ese bagaje la ha desarrollado. *Que su condición actual es el resultado de un estado neurótico pre-existente a los hechos* que motivan este pleito con una personalidad ya establecida. Que la parálisis de la pierna, si la hubo, es el producto de una fijación sintomática *pero no puede surgir ni agraviarse,* como consecuencia de una explosión". (Subrayado nuestro.)

6. "Que el demandante sufre de una personalidad histérica o condición psiconeurótica que se conoce en el campo de la psiquiatría como . . . reacción de conversión o conversión histérica.

7. "Que la pseudoparálisis y la condición de impetencia (*sic*) sexual *es irreal, o sea es imaginaria,* aun cuando el demandante no está consciente que es irreal o imaginaria." (Subrayado nuestro.)

8. "Que el hecho de que el *demandante* estuviera *expuesto a algunas manifestaciones del accidente* de la rotura del poste, no causó al demandante su condición psiconeurótica o personalidad histérica, tampoco le produjo la reacción de conversión, donde él traduce el estado de ansiedad que padece en la aparente condición de parálisis y de impotencia sexual, pues esta reacción de conversión es precisamente el síntoma de su padecimiento psiconeurótico anterior al accidente." (Subrayado nuestro.)

9. "Que su enfermedad *puede ser producida por otros motivos* que no sean un susto; estar latente y ser manifestado por otras causas de origen mental que no tengan nada que ver con un 'shock' ". (Subrayado nuestro.)

10. "Que el demandante ha pagado por concepto de hospitalización, medicinas y honorarios médicos una cantidad en exceso de $500 y continuará pagándolos hasta que recupere su salud, ha tenido pérdidas en su negocio establecido y tanto él como su esposa han padecido sufrimientos y angustias mentales."

En sus conclusiones de derecho, el juez de instancia expresa que "[l]os sufrimientos mentales como resultado de suposiciones, imaginaciones o fantasías de quien alega sufrirlos, no son recobrables". (Citas omitidas.) Y que "tampoco debe concederse compensación por manifestaciones físicas producidas por trastornos mentales imaginarios o supuestos." (Cita omitida.) Añade el juez de instancia que: "Solamente las consecuencias probables y naturaleza de los actos son las que dan margen a la responsabilidad por daños y no aquellos que son meramente posibles. (*Figueroa* v. *P.R. Ry. & Lt.*, 66 D.P.R. 488, 495)." A tenor con estas conclusiones de derecho, el tribunal de instancia declaró sin lugar la demanda con costas a la parte demandante sin incluir honorarios de abogado.

Los recurrentes apuntan la comisión de cinco errores por el tribunal de instancia, cuatro de los cuales, en síntesis, consisten de no haber concluido que la recurrida fue negligente y que tal negligencia fue la causa de las lesiones sufridas por el recurrente.

■ Debido al resultado a que llegó, el tribunal sentenciador no tuvo que hacer determinación alguna sobre si la recurrida incurrió o no en negligencia con motivo de la rotura del poste en cuestión con el consiguiente resultado del cruce de las líneas eléctricas y las explosiones y chispas dentro y fuera del hogar del recurrente. ¿Se debió el accidente en este caso exclusivamente a la negligencia de la recurrida? Sus propios empleados testificaron que el poste en

cuestión se quebró por estar podrido "como a doce pies del terreno"; que estos postes se inspeccionan dos veces al año; que dicho examen debe hacerse introduciendo un punzón con martillo a través de la corteza para determinar si el poste está podrido por dentro; que el poste debe probarse con esa herramienta de arriba a abajo a intervalos; *que si se hubiera realizado una inspección de acuerdo con las instrucciones el accidente no hubiera ocurrido;* que el poste en cuestión "mostraba tener dos pies podridos en la parte que se partió"; "era un carapacho pero como se veía bien por fuera, asumieron que estaba bien." Además, un vecino declaró que cinco días antes del accidente él le advirtió a un supervisor de líneas de la recurrida "que el centro del poste estaba podrido, indicándole que cualquier viento podría echarlo al suelo y que era mucho mejor proceder a la reparación del poste", a lo que el referido supervisor contestó que "este poste viene curado desde el tronco hasta arriba y dura una eternidad". Hemos aceptado el principio de que cualquier línea conductora de energía eléctrica es peligrosa. *Watson* v. *Virginia Elec. and Power Co.*, 100 S.E.2d 774 (Va. 1957), citado con aprobación en *Vda. de Dávila* v. *Fuentes Fluviales*, 90 D.P.R. 321 (1964). Las compañías dedicadas a generar y distribuir electricidad no tienen la responsabilidad de un asegurador y por tanto no responden en cualquier caso en que se cause un perjuicio a menos que el daño haya sido producido por su culpa o negligencia al omitir desplegar un grado de cuidado en proporción al riesgo envuelto. *Burgos Quiñones* v. *Autoridad Fuentes Fluviales*, 90 D.P.R. 613 (1964); *Vda. de Dávila*, supra, *Ramos* v. *Aut. Fuentes Fluviales*, 86 D.P.R. 603 (1962). El grado de cuidado que se exige en casos como éste incluye la obligación de realizar inspecciones periódicas. *Ramos*, supra.

A nuestro juicio, es previsible que, al quebrarse un poste que sostiene líneas de alta tensión, las líneas pueden cruzarse y producir el accidente que ocurrió en este caso y

que con tal motivo personas en la vecindad puedan sufrir lesiones físicas y síquicas. *Burgos*, supra; *Vda. de Dávila*, supra; *Pabón Escabí* v. *Axtmayer*, 90 D.P.R. 20 (1964); *Cruz Costales* v. *E.L.A.*, 89 D.P.R. 105 (1963); *Ginés Meléndez* v. *Autoridad de Acueductos*, 86 D.P.R. 518 (1962); *Baralt* v. *E.L.A.*, 83 D.P.R. 277 (1961); y *Weber* v. *Mejías*, 85 D.P.R. 76 (1962); *Leatherman* v. *Gateway Transportation Co.*, 331 F.2d 241 (7th Cir. 1964).

█ Bajo las circunstancias que acabamos de relacionar es evidente que la rotura del poste y las explosiones y chispas resultantes se debieron a la negligencia de la recurrida en no descubrir a tiempo la deficiencia en el poste en cuestión, y, más aun, al no removerlo al tener conocimiento de su condición defectuosa cinco días antes del accidente en cuestión.

█ Es regla por demás conocida que todo hecho ilícito del hombre que cause daño a otro, realizado intencional o negligentemente, es fuente de obligación. El amplio alcance de las disposiciones de los Arts. 1802 y 1803 del Código Civil (31 L.P.R.A. secs. 5141 y 5142) justifica la concesión en estos casos de todos los daños y perjuicios realmente sufridos, bien en forma inmediata o directa, o bien en forma mediata o indirecta o que posible y necesariamente se deriven del o sigan al hecho lesivo. Hace ya muchos años que rechazamos la doctrina de la Ley Común que exige que haya ocurrido un "impacto" antes de que se pueda recobrar daños morales o mentales, "por obsoleta y por no proteger un interés importante de la personalidad humana." *Infante* v. *Leith*, 85 D.P.R. 26, 38 (1962).

El problema un tanto complicado que presenta este caso es determinar, tomando en conjunto todas las circunstancias y elementos de juicio presentes, si existe relación causal entre la quebradura del poste podrido y la lesión síquica que sufre el demandante.

Para el juez de instancia no hubo relación causal—esta determinación la hizo el juez al confrontarse con el testimonio médico—específicamente de dos siquiatras con diverso enfoque en cuanto a la relación causal.

■ Se trata de la opinión de dos personas informadas, cada una tratando de hacer resaltar aquellos valores que a su juicio favorecen su conclusión personal médica. Antes de seguir, es importante reiterar que este Tribunal está en libertad de adoptar su criterio propio en la apreciación de la prueba pericial. *E.L.A.* v. *Fonalledas Córdova,* 84 D.P.R. 573 (1962); *E.L.A.* v. *Soc. Mario Mercado,* sentencia de 13 de mayo de 1965.

■ Fueron testigos por el recurrente el Dr. Anthony L. Lombardi, el Dr. Max Ramírez de Arellano y el Dr. Luis Montalvo Durán, siquiatra. El conjunto de las declaraciones de estos médicos—analizadas racionalmente, siguiendo un enfoque lógico y realista—apunta preponderantemente a la existencia de la relación de causalidad. [1]

---

[1] Para la apreciación de estos testimonios de peritos, estamos tomando en consideración los siguientes puntos:
    (1) su especialización y experiencia
    (2) tiempo en que han tratado al recurrente
    (3) su opinión médica—comparándola y analizándola con lecturas sobre el tema envuelto que hemos realizado.
Véanse: *Traumatic Medicine and Surgery for the Attorney,* Vol. 6 "Neurosis Following Trauma", pág. 76. En este capítulo comienza el Dr. Henry P. Laughlin (Associate Clinical Professor of Psychiatry, George Wash. School of Medicine), diciendo:
    "Algunos tipos de neurosis tienen una relación más íntima con un trauma que otros . . . pero la ansiedad y las reacciones hipocondríacas y de conversión forman el más frecuente patrón emocional específico de reacción a un trauma."
*Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties,* ch. 20 "Traumatic Neurosis", especialmente la sec. 20.31 sobre el problema de la causalidad enfocado bajo el tópico de aspectos médico-legales de la neurosis.
*Lawyers' Medical Cyclopedia,* vol. 3, ch. 19, "Stress and Psychosomatic Diseases" y ch. 20 "Traumatic Neurosis".
Brody, *Negligently Inflicted Psychic Injuries:* "A Return to Reason", 7 Vill. L. Rev. 232 (1961–1962).

Veamos. El Dr. Lombardi, quien ejerce la medicina general y firmó como "Attending Physician" en la clínica Maldonado el sumario de la condición del recurrente en el momento de su ingreso y salida de esa clínica, expuso en ese documento, junto al Dr. Hernández (médico interno), que "la caída de un poste de la luz eléctrica determinó el estado físico mental en que estaba Lázaro Concepción Guzmán cuando fue llevado a dicha clínica". Este médico examinó al paciente por primera vez en 1957 y lo estuvo tratando hasta el 1958. Dice que el recurrente sufre enfermedad mental y no orgánica, que no está fingiendo y que padece de una reacción

Torts, *Physical Injury Caused by Fright Compensable* Mitchell Overruled, 13 Syracuse L. Rev. 176 (1961–1962).

Smith & Solomon, *Traumatic Neuroses in Court*, 30 Va. L. Rev. 87 (1943).

Smith, *Relation of Emotions to Injury and Disease*, "Legal Liability for Psychic Stimuli", 30 Va. L. Rev. 193 (1944).

M'Niece, *Psychic Injury and Tort Liability in New York*, 20 St. John's L. Rev. 1 (1949–1950).

Small, *Gaffing at a Thing Called Cause*, Medico-Legal Conflicts in the Concept of Causation, 31 Texas L. Rev. 630 (1953).

Losli, *A Legal Dilemma*, "Injury Caused by Psychic Stimuli", vol. XL, no. 4, Denver Law Center Journal, 209 (1963).

Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev. 1033 (1936).

Throckmorton, *Damages for Fright*, 34 Harv. L. Rev. 260 (1920–21).

Bohlen & Polikoff, *Liability in New York for the Physical Consequences of Emotional Disturbance*, 32 Colum. L. Rev. 409 (1932).

Goodrich, *Emotional Disturbance as Legal Damage*, 20 Mich. L. Rev. 497 (1921–22).

*Right to recover for emotional disturbance or its physical consequences, in the absence of impact or other actionable wrong*, 64 A.L.R.2d 100; Negligence: fear of injury to another, or shock or mental anguish at witnessing such injury, as the subject of damages. Véase, especialmente, el tópico, dentro de esta anotación: "General principles as to recovery for mental or nervous effects alone", 18 A.L.R.2d 220, 222.

Oleck, *Cases on Damages*, ch. 6 "Certainty", pág. 132 (1962).

Nótese que la literatura médica ha estudiado la neurosis traumática como una lesión física por sí misma.

En el caso ante nos se presenta la reacción de conversión—que según las autoridades médicas es una de las formas que asume la neurosis traumática—como una medida de los daños y sufrimientos mentales que ha experimentado el recurrente.

de conversión donde la insanidad o miedo se convierte en enfermedad física. Expresa que la manifestación física consiste en un espasmo y dolor del brazo y pierna izquierda, de la parte izquierda del cuello, urinación involuntaria y pérdida de potencia sexual. Acepta el Dr. Lombardi que la explosión fue la causa del shock nervioso. Dice que es un caso similar a los de shock de combate—con los cuales él [médico] tuvo experiencia en la guerra. Expresó "que la enfermedad, ese estado de ansiedad, lo produce el shock nervioso prolongado: el shock original de la explosión más el estado de ansiedad prolongado durante los días subsiguientes."

El Dr. Max Ramírez de Arellano, vio al recurrente en febrero de 1957, cuatro semanas después del suceso. Es un neurocirujano y testificó en su carácter de perito en esa rama de la medicina. Testificó que del historial y examen físico tomó la impresión de que el paciente padecía de *reacción de conversión* y que esta histeria de conversión se atribuía al susto que pasó. Declaró que "es una condición psicogénica de la mente que se desarrolla en personas que tienen ciertas características psíquicas y que el cuerpo tiene que estar predispuesto para reaccionar de esa manera. Que el susto que pasó [el recurrente] tuvo que ser el factor precipitante". Expresó el Dr. Ramírez de Arellano que antes del suceso, el recurrente 'podría haber tenido todas sus actuaciones perfectamente normales". Elaborando más su tesis, el perito dice que "la predisposición estaba ahí pero los síntomas se le aparecen cuando la explosión de la estufa". Explica que predisposición es "una facilidad individual de desarrollar cualquier condición" y que agente precipitante es "el agente que actúa en la persona de cierto individuo para provocar que aparezcan los síntomas como consecuencia de esa situación". Indica que una persona con una predisposición "quizás pasaría la vida muy normal sin que viviera ningún episodio precipitante".

El Dr. Luis Montalvo Durán, siquiatra, ha tratado, en su carácter profesional al recurrente desde el 9 de junio de 1958. Expresa que el recurrente ha tenido "ocho tratamientos" y "todavía está bajo tratamiento". Testifica este médico que "Tomando en conjunto el historial del paciente llegué a la conclusión que el paciente sufrió un *traumatismo síquico* que se manifiesta por síntomas de conversión asténica, por lo que él recibió como diez o quince minutos de las explosiones". Dice que está mejorando físicamente pero está lesionado síquicamente. Sobre el cuadro actual del recurrente, dice que "[lo] he calificado como una reacción de conversión de tipo mixto crónica moderada, mentalmente competente pero con alguna limitación emocional y física para desenvolverse adecuada y normalmente en la vida". Acepta el Dr. Montalvo Durán que con motivo del accidente, el apelante sufre un trauma síquico que le produjo la conversión histérica y que de no haber sido por el trauma síquico que sufrió el 21 de enero de 1957, su condición síquica como neurológica en la actualidad no sería como es. Así que a pesar de que expresa que "cualquier accidente hubiera despertado el temor", el médico señala específicamente la explosión como la causa de la reacción del recurrente.

La parte demandada presentó como único testigo-perito al Dr. Juan A. Mascort, neurosiquiatra. Éste manifestó que le hizo un examen neurológico y siquiátrico al recurrente por dos horas. Acepta que el recurrente no tiene lesión orgánica del sistema nervioso y que presenta un cuadro clínico de conversión histérica y que no simula. Testificó, además, que el accidente en este caso produjo un estado de ansiedad en el recurrente. Añadió que "La ansiedad es la primera línea de defensa contra una situación desagradable a las personas desde el punto de vista síquico. En cuanto a la ansiedad, la mayoría de las veces es transitoria. El individuo empieza una serie de defensas síquicas contra la ansiedad. Defensas usuales y que todos usamos. Sí, nosotros tenemos una serie de

defensas que son defensas normales, tenemos otras que son anormales. . . entre ellas, la conversión histérica". Sin embargo dijo que no cree que "ninguna circunstancia de esta índole, tal como una explosión, etc., provoque la reacción que ha tenido el Sr. Guzmán". Señaló que "la chispa (es decir la parte del accidente que ocurrió dentro del hogar del recurrente) fue como dijo el compañero Ramírez de Arellano el 'trigger' para provocar la ansiedad aguda. Después vino otra serie de manifestaciones que tienen que ver con la personalidad de él. Se desarrolló la reacción de conversión que no está relacionada con la ansiedad". Según el perito, el recurrente tenía una personalidad histérica anteriormente. Hay ciertos aspectos de la declaración del Dr. Mascort que conviene destacar. A través de su declaración se percata uno que este médico es sumamente cauteloso en cuanto a señalar un hecho determinado como causa de la condición del recurrente. Responde así, a una pregunta del juez sobre si "hay otras causas que puedan haber motivado los síntomas que padece" el recurrente:

R.—"Sí señor, que estoy seguro que hay otras causas que *no sabemos* para producir esta pseudoparálisis y entre ellas hay que considerar, *no podemos considerar esto como dos y dos son cuatro;* un individuo de una personalidad neurótica tuvo este ataque del medio-ambiente, tuvo esa reacción. El no fue alcanzado por la corriente." (Subrayado nuestro.)

No es correcto afirmar que el Dr. Mascort concluyera que no había relación de causa y efecto entre el suceso y el estado actual del recurrente, pues lo que afirma él es que "estima que entre los síntomas que él [el recurrente] presentaba cuando *yo lo examiné* y el suceso no existe relación" y que considera "difícil fijar la esencia de su mal". Creemos que esa es la afirmación cautelosa de un profesional responsable que está consciente de las limitaciones que la ciencia misma le impone al tratar de determinar una relación de causa y efecto especialmente cuando, como aquí, la

relación entre médico y paciente fue tan fugaz—escasamente dos horas. ¿Es ese tiempo suficiente para que un médico se percate del cuadro clínico completo de una persona con un desorden emocional y pueda con razonable certeza señalar causas? (²)

Nos parece conveniente citar aquí del artículo *Psychic Injury and Tort Liability in New York*, 24 St. John's L. Rev. 1, 73, lo siguiente en cuanto a problemas que presenta el testimonio pericial en casos de lesiones síquicas:

"La razón principal de por qué es admisible el testimonio pericial en cualquier caso, es por supuesto, una de necesidad. . . . Las cuestiones que surgen al considerar la admisibilidad de testimonio pericial son, pues (1) si la materia del caso es una de peculiar complejidad; (2) si hay disponible opinión pericial competente.

"Se cree que es ineludible la conclusión de que el problema principal en un caso de lesión síquica es uno de evidencia . . . . La cuestión central es pues la confiabilidad del testimonio pericial en este campo pues es el único aparente método válido de establecer la extensión del perjuicio y el hecho de la causalidad es mediante testimonio pericial. Basado en el análisis hecho en este artículo, se señala que ciertas proposiciones relativas a testimonio neurosiquiátrico han sido bien establecidas. Por ejemplo, aparece claro que una alta proporción de los casos de disturbios síquicos envuelven reclamantes que son víctimas de desórdenes de personalidad preexistentes. Estos desórdenes, cuando son de naturaleza leve y moderada son precipitados por un trauma síquico o físico que ocurre en el momento del accidente, y que se agrava hasta ser observable fácilmente. Como corolario de esta proposición, puede decirse que el llamado individuo 'normal' no sufrirá reacciones síquicas con motivo de un trauma físico o síquico,

---

(²) "La ciencia médica no es una ciencia exacta, y serán muchas las veces en que los criterios médicos sean incompatibles en cuanto a la causa médica de la lesión que sufre el reclamante. Esta no es una realidad nueva para las cortes." *Injury by Psychic Stimuli*, vol. XL, Denver Law Center Journal 209 (1963).

Véase la colección y comentarios de casos de cortes estatales sobre compensación y otros aspectos de daños cuando se han alegado daños síquicos: *Lawyers' Medical Cyclopedia Supplement, Traumatic Neurosis*, págs. 376–388.

a menos que el trauma sea de larga duración o gran intensidad. Sin embargo, en los casos marginales no puede formularse una regla precisa por virtud de la cual se pueda determinar si la reacción sufrida por el reclamante es 'normal' o una idiosincrática y en el actual estado del conocimiento siquiátrico, inevitablemente debe existir esta área de 'sombra' en relación con la cual los peritos pueden estar en desacuerdo. Como todo depende del conjunto preexistente de la personalidad del reclamante, la fuerza del estímulo . . . y la susceptibilidad del reclamante al estímulo, existe una gran posibilidad de desacuerdo entre los peritos en los casos marginales. *Es aquí donde el concepto popular de la siquiatría como una ciencia exacta debe caerse ante la embestida de los hechos escuetos*, pues la siquiatría, es, en última instancia, una combinación de ciencia y arte". (Subrayado nuestro.)

La prueba médica estableció que el recurrente es de una personalidad histérica, neurótica; tenía que estar predispuesto para reaccionar como lo hizo; como dijo el testigo Dr. Mascort, la conversión histérica del recurrente fue una defensa síquica anormal que se produjo contra la ansiedad aguda que le ocasionó el accidente.

La prueba pericial que hemos resumido con gran brevedad nos lleva a la conclusión de que existe una relación causal([3]) entre el accidente y el estado síquico que comenzó a desarrollarse en el recurrente inmediatamente después, hasta culminar en un estado de conversión histérica o reacción de conversión, y que por lo tanto debe responsabilizarse a la recurrida por los daños morales sufridos por los reclamantes. *Leatherman*, supra; *Humphries* v. *Delta Fire & Casualty Company*, 116 So.2d 130 (La. 1959). Véanse, además, *Battalla* v. *State*, 176 N.E.2d 729 (N.Y. 1961); *Irwin* v. *St. Louis-San Francisco Ry. Co.*, 30 S.W.2d 56 (Mo. 1930); *Sundquist* v. *Madison Rys. Co.*, 221 N.W. 392 (Wis. 1928).

El cuarto error apuntado por los recurrentes se refiere a la negación de la compensación solicitada por los daños

---

([3]) *Feliciano Figueroa* v. *Comisión Industrial*, 84 D.P.R. 196 (1961). Cf. *Ortiz Candelario* v. *Comisión Industrial*, 90 D.P.R. 387 (1964).

sufridos por ellos. En vista de la conclusión a que hemos llegado responsabilizando a la recurrida, procede ahora determinar la cuantía de la compensación a que tienen derecho los recurrentes en este caso.

No tenemos arbitrio absoluto para negar o conceder la reparación de los daños y perjuicios causados, con arreglo a nuestro discrecional criterio, sino que debemos conceder lo que fuera procedente conforme a lo que haya sido probado. La operación resarcitoria se hace difícil cuando en la estimación económica entran en juego elementos que no son tan ostensibles como el daño o lesión física. Pero si se determina, como hemos determinado, que los perjuicios se han producido y que son consecuencia inmediata o mediata del hecho lesivo o que se han derivado de él de un modo u otro, o que necesariamente siguen al mismo, debe procederse a la fijación del *quantum* económico que los compensa tomando en cuenta las circunstancias específicas del caso: es necesario que se pruebe cómo dichos daños han afectado la salud, el bienestar y la felicidad del damnificado. *Ramos Rivera* v. *E.L.A.*, 90 D.P.R. 828 (1964) ; *Infante*, supra; *Hernández* v. *Fournier*, 80 D.P.R. 93 (1957). Pero queda al sano juicio la experiencia y discreción del juzgador señalar la cuantía necesaria y justa para compensar los daños y perjuicios sufridos. (⁴) *Infante*, supra; *Arcelay* v. *Sánchez*, 77 D.P.R. 824, 850 (1955).

El recurrente reclama cuantiosos daños, a saber: (a) por la pérdida de su salud y por su actual incapacidad física;

(⁴) Y en un caso como éste no es tarea fácil la del juzgador y a ese efecto se ha dicho:

"Es un hecho innegable que casi todos los casos en que se alega una lesión traumática están sujetos a controversias. La determinación del grado de responsabilidad, y la determinación de una compensación justa y razonable por los daños sufridos son tareas que constituirían un reto aun para un Salomón del siglo XX." *Emotional Disability and Compensation, Traumatic Medicine and Surgery for the Attorney*, vol. 6, pág. 82.

Véanse: Oleck, *Damages to Persons and Property, Personal Injuries in General*, pág. 238 y Ch. XIV, *Pain and Suffering*, pág. 247, esp. "Case Law on Psychosomatic Damages", sec. 177F.

(b) por angustias mentales; (c) por erogaciones imprevistas y gastos en que ha incurrido para su tratamiento médico; (d) por gastos extraordinarios para la administración de su negocio; y (e) por gastos de reparación de efectos eléctricos del hogar. En total, el recurrente reclama $110,965.00 por los daños sufridos. Tenemos ante nosotros el siguiente interrogante, ¿han sido todos esos daños probados? Veamos. Aunque se alegó que con motivo del estado del recurrente éste ha sufrido pérdidas en su negocio, lo cierto es que la prueba demostró lo contrario, pues el propio recurrente testificó que el negocio "va pa' alante, o sea que va en progreso económicamente. Ha ido subiendo, subiendo y seguirá subiendo porque el negocio más cerca del mío queda a más de dos kilómetros y es un sitio que se fabrica mucho, que está yendo mucha gente allí. En vez de ir para atrás va para alante." Y este progreso ocurre bajo la dirección y atención del recurrente no obstante su estado mental, que por lo visto no lo ha imposibilitado para ello.

En cuanto a gastos de hospitalización, medicinas y honorarios médicos, el juez sentenciador concluyó que el recurrente ha gastado en exceso de $500. Aunque se reclamaron $140 por concepto de gastos de reparación de los dispositivos eléctricos del hogar de los recurrentes que fueron averiados por la explosión al cruzarse las líneas eléctricas de la recurrida, no se presentó prueba precisa de dichos gastos. El recurrente sólo declaró que él ajustó el arreglo de la estufa en $130.00, aplazándose para más luego ofrecer prueba de estos daños, cosa que no se hizo.

Nos resta por estimar la cuantía de la compensación por los sufrimientos y angustias sufridos por el recurrente con motivo de su estado, así como los sufridos por la reclamante.

■ De la prueba médico-pericial surge que el recurrente adolecía de una condición mental con anterioridad al accidente consistente de "ciertas características síquicas" o "fijación"; "tenía miedo de quedarse paralítico como su

mamá". Debido a este estado y siendo el accidente el factor precipitante, el recurrente pasó al estado de conversión histérica o reacción de conversión. Como no se ha demostrado qué parte del estado de conversión del recurrente se debe a la condición preexistente y qué parte al trauma ocasionado por el accidente, ni que la condición preexistente habría de empeorarse en ausencia del trauma, la recurrida, cuya negligencia ocasionó el mismo, debe asumir la responsabilidad por todo el daño sufrido. *Intermill* v. *Heumesser*, 391 P.2d 684 (Col. 1964); *Watson* v. *Wilkinson Trucking Co.*, 136 S.E.2d 286 (S.C. 1964); *Evans* v. *S. J. Groves & Sons Co.*, 315 F.2d 335, 347–348 (2d Cir. 1963); *United States* v. *Fotopulos*, 180 F.2d 631 (9th Cir. 1950); *Rachal* v. *Bankers & Shippers Insurance Company*, 146 So.2d 426 (La. 1962); *Hazelwood* v. *Hodge*, 357 S.W.2d 711 (Ky. 1962); *Wise* v. *Carter*, 119 So.2d 40 (Fla. 1960); *Guillory* v. *Godfrey*, 286 P.2d 474 (Cal. 1955); *Owen* v. *Dix*, 196 S.W.2d 913 (Ark. 1946); *Castaldo* v. *Transportation Vehicles, Inc.*, 180 N.Y.S.2d 368 (1958); Harper & James, *The Law of Torts*, Vol. II, sec. 20.3; *Restatement of the Law, Torts*, sec. 461; Prosser, *Law of Torts*, 3rd ed., pág. 248.

Es necesario que hagamos ahora un breve resumen de los sufrimientos y angustias que sufrió el recurrente desde la ocurrencia del accidente. Testificó que, al regresar al balcón de su casa del pastizal cercano, a donde corrió con su familia, cuando se percataron de la explosión afuera y de "la humentá y fuego dentro de la cocina" en ciertos dispositivos eléctricos, empezó a sentir frío, deseos de vomitar, se cayó y no supo más nada hasta que descubrió que estaba en la clínica Maldonado, donde estuvo dos o tres días. El Dr. Hernández le notó un ligero espasmo y palpitaciones; llegó a la clínica el 21 de enero de 1957, nervioso, excitado y sudoroso quejándose de disturbios en el estómago; dos días después el recurrente le dijo que sentía como que se le iba la cabeza; al día siguiente se quejó de tortícolis; tenía la cabeza inclinada

hacia el lado derecho; abandonó el hospital sin permiso. Dijo el recurrente que al salir de esa clínica sentía el lado izquierdo del cuerpo paralizado; sufría de emisiones nocturnas, involuntarias, de orina y de semen; se trasladó a la clínica Pereira en el Professional Building donde estuvo unos 22 días. Sintió los mismos síntomas, pero fue mejorando lentamente. El Dr. Ramírez de Arellano que lo examinó allí testificó que encontró al recurrente nervioso y débil, tieso en el lado izquierdo; se quejaba de dolor en el cuello, en el lado derecho, de debilidad en el brazo y la pierna izquierda y dolor de cabeza en el lado izquierdo; tenía un temblor intermitente muy marcado en el lado izquierdo del cuerpo y la cabeza; arrastraba la pierna izquierda; padecía de reacción de conversión. Aunque los nervios craniales estaban intactos y "[s]u funcionamiento estaba todo bien", no simulaba los síntomas que sufría. Lo volvió a ver en octubre del mismo año y pudo notar que la reacción de conversión seguía igual, sentía los mismos síntomas y se quejaba de impotencia sexual. Al salir de la clínica Pereira tuvo que usar un bastón para ayudarse al caminar y aún así sufrió dos o tres caídas; arrastraba el pie izquierdo; sentía que el lado izquierdo de la cabeza le quería explotar, "como cuando le cae mucha agua en la cabeza y quiere salir". El Dr. Lombardi, quien lo tuvo bajo tratamiento, testificó que el paciente mostraba todos los mismos síntomas notados por el Dr. Ramírez de Arellano. Lo refirió al siquiatra Dr. Montalvo quien lo ha estado tratando desde junio de 1957. Dice que para enero de 1959 ha mejorado bastante "Sobre todo de la condición emocional que se le estaba manifestando por mal humor, irritabilidad, falta de ánimo y tendencia a acelerar, susto, insomnio, pesadillas durante las cuales peleaba dormido, se levantaba a tirar puños . . . está ahora perdiendo la tensión . . . le quedan algunas cosas sicosomáticas como son dolores de la nuca, algunos movimientos en los músculos del cuello, sensaciones seneslésicas en la cabeza . . . . Le queda en el lado izquierdo

debilidad y del cuello está todavía débil . . . . Se sigue sintiendo cansado porque realmente cuando camina sigue arrastrando la pierna izquierda . . . . Está lesionado síquicamente . . ., irá mejorando con los años . . . necesita tratamiento siquiátrico indefinidamente." Ha recobrado en parte su potencia sexual. Belén González, esposa del recurrente, declaró que luego de regresar su esposo a la casa después del accidente, no lo volvió a ver hasta tres días después en una clínica porque sus cuatro hijos se echaban a llorar cuando ella hacía arreglos para ir a visitarle; cuando regresó el recurrente de la clínica, como al mes empezaron las malas noches durante muchos meses. Dice que "Yo apenas dormía de noche, porque él se levantaba como loco queriéndose ir, tirando puertas, tirando puños y yo con miedo que no fuera a darle un golpe a los nenes y a mí, no podía dormir. A veces se orinaba en la cama y había que estarlo cambiando. Cuando no era gritando". Le daba sobos, masajes en la pierna y en el brazo, por instrucciones que le dieron; que por motivo de esa situación sufrió mucho; que desde el accidente no ha hecho vida marital con el recurrente porque éste ha tratado y no puede.

Bajo las circunstancias que acabamos de resumir, estimamos en $15,000 todos los daños morales y materiales sufridos por el recurrente y en $1,000 los de la recurrente resultantes del accidente a que dio lugar la negligencia de la recurrida. *Leatherman*, supra; *Humphries*, supra.

*En vista de lo expuesto debe revocarse la sentencia dictada por el tribunal de instancia en este caso, y en su lugar dictarse otra condenando a la recurrida a pagar a los recurrentes la suma de $16,000 en resarcimiento de los daños que han sufrido.*