LUIS ANTONIO GONZÁLEZ y OTROS, demandantes y recurridos, *v.* MARYLAND CASUALTY COMPANY y OTROS, demandados y recurrentes.

*Número:* R-67-276    *Resuelto:* 3 de febrero de 1970

*Rivera Zayas, Rivera Cestero & Rúa* y *Rodolfo Cruz Contreras,* abogados de los recurrentes; *B. Hernández Vargas,* abogado de los recurridos.

PER CURIAM: Concluyó el tribunal de instancia que como consecuencia del choque ocurrido en 17 de mayo de 1963 entre el taxi propiedad del recurrente González Detrés y el vehículo conducido por el recurrido Luis Antonio González, al desviarse aquél e invadir el carril donde se había detenido dicho recurrido en la Avenida Ponce de León, cerca de la Parada 36 en Río Piedras, González sufrió un ataque de nervios que agravó una condición emocional y nerviosa que se manifiesta en ansiedad, agitación, temblor y sudoración.

En su sentencia, el tribunal de instancia condenó a los recurrentes a pagar, por concepto de daños y perjuicios,

| | |
|---|---:|
| a Luis Antonio González | $15,000 |
| a su esposa Haydee Albertorio de González | 1,000 |
| a su madre Crucita Meléndez | 500 |

Expedimos el recurso solicitado, con el único objeto de revisar la conclusión del tribunal de instancia al efecto de que el accidente en cuestión agravó la existente condición emocional y nerviosa del referido recurrido. Concluimos que el tribunal de instancia incidió.

A los efectos de determinar si esta conclusión está justificada es necesario resumir la prueba aducida con respecto a la condición mental de González antes y después del accidente.

Sobre el referido recurrido existe un extenso historial médico en la Administración de Veteranos que fue presentado en evidencia. Demuestra que:

(1) Desde su niñez, cuando fue pateado por un caballo, González padece de una siconeurosis severa que se manifiesta por nerviosidad, ansiedad, aprehensión, temblores, histeria simulada y ataques de tipo epiléptico. Fue recluido en la Clínica Juliá por unos días en el 1946. A los efectos de salir de allí, en contra del consejo de los médicos, el Dr. Maymí expidió un informe del examen que le hizo que dice: "Por los últimos trece meses el paciente ha venido sufriendo de un severo estado crónico de ansiedad, que tuvo un súbito acceso luego de sufrir un accidente de automóvil. Sufrió una reacción de pánico agudo; ésta ha sido la base de su actual neurosis de ansiedad. No ha mejorado." En 1952 un trabajador social siquiatra, luego de entrevistarlo informó que "El paciente es tímido, limitándose a contestar preguntas de trabajador. Parece tenso, se mantiene frotándose las manos y en un momento parecía a punto de llorar. Estaba muy deprimido. Aparentemente su ajuste social e industrial es bastante limitado . . . no tiene planes de obtener un trabajo remunerado."

(2) El Dr. José Jiménez, como resultado del examen siquiátrico que realizó del recurrido en 24 de julio de 1954, informa que "alega que le da verguenza dar la impresión de ser un individuo saludable y robusto capacitado para realizar trabajo fuerte cuando en realidad depende completamente de su padre para su sostenimiento y el de su familia." Más adelante este informe señala que "Se favorece el diagnóstico de reacción de conversión porque cuando el paciente está completamente inactivo su comportamiento es casi normal pero le entra pánico y asume una conducta bizarra cuando se confronta con situaciones indeseables o cuando tiene que trabajar para su sostenimiento."

(3) Su esposa, en carta de 20 de diciembre de 1955 informa que "debido a las condiciones físicas de mi esposo está prácticamente incapacitado para ejercer ninguna clase de trabajo . . . este asunto de no conseguir empleo ha creado en

él cierta preocupación mental que, a mi juicio, ha empeorado su situación nerviosa convirtiéndolo en un tirano que nuestras vidas corren algún riesgo."

(4) El trabajador social clínico, Alfonso Rivera, en su récord de 22 de octubre de 1959, informa que González aparece retirado dentro de sí, sin espontaneidad, trémulo e incapacitado para dar datos relevantes o recordar eventos pasados. Demuestra una completa indiferencia hacia su ambiente. Tiene la tendencia de permanecer solo y cuando se le molesta se irrita y empieza a temblar y a veces pierde el conocimiento. No resiste argumentos en contra de sus ideas y cuando encuentra oposición se convierte en agresivo.

(5) En 21 de mayo de 1963, cuatro días después del accidente González y su esposa comparecieron ante la Administración de Veteranos con el objeto de que se le aumentase la pensión. Se le había concedido un 10% de incapacidad en 1947. Esta se aumentó a 30% en 1959 y a 70% en 7 de octubre de 1963. El aumento se basó en su incapacidad para trabajar debido a la condición descrita en el informe del Dr. Mattei cuyas observaciones en cuanto a la condición siquiátrica de González no variaron de las anteriores de 1959 excepto que indica que ya el paciente no trabaja.

(6) Seis meses después del accidente, González suscribió un estado sobre su ingreso neto y empleo en el cual declaró que *él quedó totalmente incapacitado en noviembre de 1962;* que lo más que había ganado eran $1,000 en un año trabajando con su padre y que no había vuelto a trabajar desde que se incapacitó; que tuvo que dejar su último empleo debido a que se agravó su condición nerviosa al extremo que ni podía ayudar más a su padre. Durante todas estas gestiones a fin de aumentar la pensión de González, no se hizo referencia alguna al accidente que ha motivado este litigio.

El siquiatra Dr. Ramón Alonso Santiago testificó sobre la condición del recurrido González a quien examinó por es-

pacio de unas dos horas en dos ocasiones dos años después del accidente. Su diagnóstico fue de "conversión" y de "reacción de ansiedad severa". Testificó que entendía que la condición después del accidente era más severa que antes "a juzgar por lo que el paciente me dijo." Testificó que el accidente imposibilitó al recurrido de trabajar "a raíz del accidente." Al confrontársele con los diferentes informes médicos y de los trabajadores sociales especializados en siquiatría, admitió que la descripción de la condición del recurrido que surge de tales informes es cónsona con el estado de conversión y ansiedad severa. Testificó que el diagnóstico del Dr. Maymí hecho en 1946 es el mismo que el testigo hizo en 1967. Testificó que coincide con la expresión del Dr. Jiménez (párr. 2 anterior). Preguntado si la conducta del recurrido de mentir al contestar el formulario de ingreso y empleo de la Administración de Veteranos es compatible con el estado de ansiedad, contestó: ". . . diría que hay relación íntima y directa, que es comprensible."

En cuanto al accidente, el recurrido testificó que:

". . . yendo yo por el carril interior de la Avenida Ponce de León, veo a cierta distancia a un taxi que viene zigzagueando; entonces le digo a mi esposa que tome precauciones porque lleva un nene de dos meses en los brazos—toma precauciones porque este hombre a lo mejor va a doblar por ahí. Lo vi a cierta distancia. Pude precisar. Le dije: un momento, espérate. Freno mi carro, saco la mano, hago mis señales y vino de frente y me impactó mi carro . . . . Veo ese taxi que viene, freno y de frente me da aquí . . . . Yo me bajé de mi carro; entonces mi mamá está herida, mi esposa está recién operada, de cuatro meses de operada de la vesícula y dos meses de una Cesárea. Mi esposa, oí, cuando el impacto unos quejidos de ella y nerviosísima. Los tacos de los zapatos se encrustaron [sic] en la alfombra de mi carro; que los señores estos desencajaron los zapatos; me la auxiliaron y se la llevaron al hospital. Yo me quedo en el carro. Los carros quedan enganchados; mi carro con el radiador roto, que tuvo la policía que moverlos para un solar que hay al lado . . . . El daño mayor mío es esta cosa que yo tengo, que pueden

presenciar . . . . El carro mío, yo vengo por este lado; mi carro queda así y viene este taxi, que se salió para acá y viene, frente por frente, quedando enganchado por debajo del mío . . . . Por el bumper delantero, enganchado . . . . Que tuvimos que bajarlo a base de gatos y de peso de personas para poderlos desenganchar."

Con respecto a los daños que sufrió con motivo del accidente testificó el recurrido que para la fecha del accidente era viajante de Antonio A. Durán, Inc., en la venta de enseres eléctricos y juguetes, todo el año. Trabajó con esta firma durante cinco años a comisión. Testificó que "Unos con otros me salen [la comisión] no menos de $500 mensuales." Preguntado si después del accidente siguió trabajando para Antonio Durán contestó:

"A raíz de eso traté y estuve como dos meses en el trabajo; entonces me fue afectando esta condición y entonces ellos mismos me recomendaron que viera un médico; que tomara un descanso. Por más que quería volver no pudo seguir en el trabajo.

.     .     .     .     .     .     .     .     .

Yo tengo una familia que mantener; tenía que trabajar; no podía amontonarme. Seguí trabajando. Mi patrono me dijo: 'yo le recomiendo que vea un médico.' Yo traté de seguir trabajando. El me decía: 'no puede seguir trabajando.' Eso ha sido la causa de todo.

.     .     .     .     .     .     .     .     .

Me bajaron mis ventas. Iba a ver un cliente y me recuerdo un día que no le podía hacer su factura, me la tenía que hacer él. Un día llegué a un extremo que me dieron unas pastillas, hasta me dormí por esa carretera de Cayey."

La prueba aducida de las liquidaciones de las comisiones que se le pagaron al recurrente por sus gestiones como vendedor demuestra que recibió un promedio mensual durante.

| 1959 | de | $283.00 |
|------|-----|---------|
| 1960 | de | 112.55 |
| 1961 | de | 199.66 |
| 1962 | de | 263.11 |
| 1963 | de | 166.63 |

En el mes de mayo de 1963 sólo se adujo como prueba el pago de una comisión de $15.94 durante una semana de dicho mes (lo cual concuerda con el testimonio del Dr. Alonso de que el recurrido quedó imposibilitado de trabajar "a raíz del accidente") pero no aparece si esa fue la totalidad de los pagos durante dicho mes o si en otras semanas de mayo de 1963 hizo ventas por las que le abonaron comisiones adicionales. Durante junio de 1963 recibió $104.21 en comisiones, durante julio $91.31, durante agosto $142.46 y durante septiembre $203.85. Por la última semana informada de su actividad comercial que fue en septiembre de 1963, recibió un pago de $172.34 que es uno de los pagos mayores por una semana de trabajo recibido por el recurrido por concepto de tales comisiones.

En el contrainterrogatorio con respecto a tales ingresos y su incapacidad total, admitió el recurrido que mintió al suministrar la información que aparece en el estado de sus ingresos y empleo a que hicimos referencia bajo el párrafo seis anterior. Preguntado si había informado a la Administración de Veteranos sobre el accidente, contestó "No se lo informé porque hay mentiras piadosas. Si usted se va a arrimar a una buena sombra no va a decir eso. Yo me arrinconé a un palo bueno. Yo tenía el derecho era justo que se me recompensara. Si no lo hago así mire a ver lo que sería de mí . . . a lo mejor si le digo eso, ahí a lo mejor ni me pensionan." Más adelante el contrainterrogatorio continúa así:

"P. ¿Usted mintió para lograr la pensión?

"R. Seguramente, para lograr la pensión. Yo he llenado esos papeles.

"P. ¿De acuerdo a lo que le convenía para lograr la pensión?

"R. Seguramente que sí."

También mintió el recurrido al negar que padeciese de "esa" nerviosidad en el ejército y que hubiese temblado o de que hubiese informado a alguien que temblaba mientras estuvo en el ejército.

Creemos que las circunstancias de este caso son distinguibles de las de *Concepción Guzmán* v. *A.F.F.*, 92 D.P.R. 488 (1965). En este último caso se trataba de una persona "de una personalidad histérica, neurótica". Concluimos que hubo una relación causal entre el accidente (explosión dentro del hogar que soltaba chispas, ocasionada al quebrarse uno de los postes que sostenía una línea de alta tensión cruzándose los alambres y produciendo una explosión con gran estrépito) y el estado síquico que comenzó a desarrollarse inmediatamente después hasta culminar en un estado de conversión histérica o reacción de conversión, conclusión comprobada por el testimonio de tres conocidos médicos que atendieron y trataron extensamente al recurrido durante largo tiempo. El neurosiquiatra de la recurrida que lo examinó durante dos horas fue el único que concluyó que "entre los síntomas que él [el recurrente] presentaba cuando yo le examiné y el suceso no existe relación." En *Concepción Guzmán,* supra, el recurrente perdió el conocimiento casi inmediatamente después de la explosión. La recobró en el hospital y desde entonces manifestó los síntomas claros e inequívocos de su estado de reacción de conversión. No hubo prueba en este caso de que el paciente padeciese de reacción de conversión antes de la explosión.

En el caso ante nos, al ocurrir el accidente, el recurrido no perdió el control de sí mismo. Se ocupó de que su esposa y su hija y su madre fueran atendidas y de que su vehículo se moviese a un solar vacío. Recordaba un sinnúmero de detalles del accidente y de sus resultados. No sufrió lesión corporal alguna. La condición de reacción de conversión existía en el recurrido desde hacía muchos años. No obstante podía trabajar y después del accidente continuó trabajando por unos meses más. Su conducta de mentir para lograr una pensión mayor de la Administración de Veteranos y en la silla de los testigos en relación con su estado mental mientras estuvo en el ejército, es indicativa de un propósito de

obtener una pensión mayor, además de una compensación también mayor a través del trámite de su reclamación a través de este litigio.

Creemos que la prueba del estado mental del recurrido que se desprende de su récord en la Administración de Veteranos claramente estableció que el recurrido padecía de una reacción de conversión por muchos años. Ante esta prueba, y tomando en consideración la conducta del recurrido previamente descrita, es de escaso valor el testimonio del siquiatra, que a su petición lo examinó dos veces durante dos horas cada vez, dos años después del accidente, y quien testificó que a juzgar por lo que el recurrido le dijo la condición mental de éste era más severa que antes del accidente en cuestión.

*En vista de lo expuesto, se debe modificar la sentencia en este caso con el fin de reducir la cuantía de los daños concedidos al recurrido a la suma de $1,000.00. Así modificada debe confirmarse.*

El Señor Juez Presidente no intervino. El Juez Asociado Señor Santana Becerra es de opinión que debe concederse una compensación de $4,000 al recurrido.