JUAN VALLDEJULI RODRÍGUEZ y JUANITA P. DE VALLDEJULI, demandantes y recurrentes, *v.* AUTORIDAD DE ACUEDUCTOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO ET AL., demandados y recurridos.

*Número:* R-66-289     *Resuelto:* 11 de mayo de 1971

*Guillermo Cintrón Ayuso* y *José F. Quetglas Álvarez,* abogados de los recurrentes; *González & Rodríguez,* abogados de los recurridos.

PER CURIAM: El recurrente, demandante en el pleito original, reclamó compensación por sufrimientos mentales, físicos y gastos incurridos alegadamente resultantes de una caída que sufrió el día 19 de septiembre de 1963 alrededor de la 1:00 y 1:15 de la tarde al resbalar cerca de una alcantarilla de la Calle Comercio de San Juan. Alegó en su demanda que al caer al pavimento se ensució todo su traje y cuerpo con las materias fecales y aguas negras que salían del sistema de alcantarillado, el cual se había desbordado por las lluvias torrenciales que habían caído ese día, sufriendo, además, golpes en diferentes partes del cuerpo y desarrolló una hernia umbilical que requirió intervención quirúrgica para su reparación. Solicitó una compensación de $88,500.00 que luego redujo, al desistir durante el juicio de la partida de $50,000.00 de daños sufridos por su esposa, a $38,500.00.

El Tribunal Superior declaró con lugar la demanda basada en la negligencia combinada de la Autoridad de Acueductos y el Gobierno de la Capital, imputable a su compañía aseguradora, aquí recurrida, fijando los daños del recurrente en la suma de $500.00.

El planteamiento principal del recurso descansa en el apuntado error del tribunal sentenciador al concluir que la hernia del demandante no fue producida por la caída que éste sufriera el día del accidente, pero aunque así fuere, la compensación de $500.00 por daños y la de $100.00 por

honorarios de abogado resulta ser sumamente injusta e inadecuada en consideración a los daños probados.

El Tribunal Superior recibió el testimonio de dos cirujanos. El primero, el Doctor José Noya Benítez, declaró que examinó al recurrente al día siguiente del accidente; que éste presentaba "una hinchazón en la región umbilical, pequeña, pero que al hacer un esfuerzo o al toser, aumentaba en tamaño" (T.E. pág. 14). Diagnosticó la condición como "una hernia umbilical adquirida o desarrollada recientemente" recomendando al paciente se operara para corregir el defecto (T.E. pág. 15). El Doctor Noya practicó la operación. No hubo complicaciones de clase alguna y el paciente fue dado de alta siete días después (T.E. pág. 16). En su declaración, el Dr. Noya testificó que llegaba a la conclusión de que la hernia había sido causada por el trauma de la caída. Basó esta opinión únicamente en el historial dádole por el paciente negativo de haber sentido ". . . nada ni había tenido ningún malestar ni ninguna hinchazón en esa región" (T.E. pág. 18) con anterioridad. Declaró, además, que por el examen y operación que él practicara no podía determinar si la hernia había sido causada por el accidente (T.E. pág. 37).

Básicamente el tribunal sentenciador entendió que tenía que resolver un problema de causalidad. En otras palabras, si existía relación causal entre el esfuerzo de la caída y la hernia umbilical que desarrolló el recurrente.

El Tribunal Superior adjudicó esta cuestión adversamente al criterio del médico del demandante. Resolvió que la hernia del demandante no fue producida por la caída que éste sufriera. El Tribunal aceptó la opinión del perito médico Doctor Alfredo D'axtmayer apoyándose en ella y otras autoridades en la materia que citó para adjudicar la controversia.

La lectura de los testimonios de los médicos no debe dejar lugar a duda que el testimonio del Doctor D'axtmayer frente al del Doctor Noya no planteó un conflicto sobre la cuestión de causalidad. El Dr. D'axtmayer examinó al recurrente dos

años después de la operación. Declaró que para la fecha de dicho examen "lo único" que presentaba "era una cicatriz como de tres pulgadas de largo, orientada transversalmente, más abajo del ombligo" (T.E. pág. 61) ; y que para esa fecha no podía determinar "ni si había hernia, menos puedo determinar qué clase de hernia era, yo no lo ví con la hernia" (T.E. pág. 71).

El testimonio del Doctor D'axtmayer técnicamente no podía, pues, servir de apoyo a la determinación del Tribunal al efecto de que la ". . . hernia del demandante *no* fue producida por la caída que éste sufriera el día antes de su operación." (Conclusión de Hecho número 11, subrayado nuestro.)

Puesto en perspectiva, el alcance que tuvo el testimonio del Doctor D'axtmayer fue, a nuestro juicio, plantear una controversia sobre suficiencia de prueba para llegar a una determinada conclusión médica más bien que un conflicto de prueba sobre la cuestión de causalidad. Por un lado el Doctor Noya había declarado, como hemos visto, que su conclusión de que la hernia había sido causada por el trauma de la caída estaba basada *únicamente* en el historial que le dio el paciente, y, además, que basado en el examen y operación que él practicara *no* podía determinar si la hernia había sido causada por el accidente.

El Doctor D'axtmayer, por otro lado, fue enfático en su opinión. Los *hallazgos* en la operación son más objetivos, a juicio suyo, que el *historial* y que si esos hallazgos no se encontraron presentes él diría que la hernia no era traumática (T.E. págs. 64–69). Más adelante, contestando preguntas del juez, explicó por qué, a juicio suyo, no se puede llegar a una conclusión de que la hernia fue traumática basada únicamente en el historial del paciente. Explicó el Doctor que al realizar la operación "hay que ver algo en el tejido, hemorragia o algo . . . algún hallazgo". (T.E. pág. 84.)

"R—O sea, los tejidos de la pared abdominal indican, sea en el ombligo o donde sea . . . si una persona recibe una herida, trauma o golpe contundente o se desgarra ahí tienen que romperse capilares o venitas, tiene que haber hemorragia, eso tiene que haber dejado hemorragia, poca o mucha, pero tiene que haber dejado hemorragia, no como cuando uno corta que la sangre es fresca y roja, sino que a los dos días ya es un poco vieja, ya es sangre oscura, quizás coagulada, ensangrentando los tejidos y eso forma, se produce inflamación, o reacción de los tejidos que ya no son normales, además de que haya una hernia.

P—Si una persona se cae, una caída fuerte, y cae sentado o cae de lado y no hay esa hemorragia, usted no concurre?

R—Entonces la hernia no puede ser debida a la caída, si no hay esos hallazgos." (T.E. pág. 85.)

■ A nuestro modo de ver, la cuestión clave suscitada por el testimonio del Doctor D'axtmayer giraba alrededor de la *suficiencia* de la evidencia médica presentada por el recurrente para establecer la relación de causa y efecto entre el esfuerzo repentino de éste al caer y la aparición de la hernia. Pero el hecho de que el juez ubicara la controversia fuera de dicho ámbito no es de por sí decisivo a la solución de este recurso, ni exige un resultado distinto al que evidencia la sentencia recurrida.

■ Sabido es que los tribunales de instancia, como este Tribunal en ejercicio de su facultad revisadora, tienen amplia discreción en la apreciación de la prueba pericial pudiendo, aun, adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla aunque resulte técnicamente correcta. *Prieto* v. *Maryland Casualty Co.*, 98 D.P.R. 594 (1970); *Concepción Guzmán* v. *A.F.F.*, 92 D.P.R. 488 (1965).

■ Para el recurrente el esfuerzo repentino de su caída y la hernia umbilical que desarrolló no eran hechos desasociados. El historial que le suministró al médico, y sobre el cual éste basó su opinión, fue al efecto de que hasta el mo-

mento de la caída no había tenido malestar ni hinchazón en esa región. Por lo tanto, era natural que el recurrente excluyera de su mente cualquier otra posibilidad como, por ejemplo, la posibilidad de una hernia desapercibida, o aún incipiente, pero revelada a raíz de la caída. Fue dentro del estrecho marco de ese historial que el médico basó su opinión. El médico limitó las bases de su opinión pericial. Entendió, quizás con algún sentido lógico, que la hernia, según el historial, había sucedido tan repentinamente que no justificaba ninguna otra conclusión que la de origen traumático. En ausencia de otra evidencia en el récord que apunte hacia la probabilidad de una relación de causalidad no nos parece que, en justicia, debemos intervenir con la adjudicación del tribunal sentenciador. La conclusión del perito médico del recurrente ubicado, como lo fue, dentro del limitado marco del historial del paciente, por más relevante y útil que éste fuera, nos impide darle acogida a una posible teoría de compensabilidad basada en precipitación, agravación o aceleración de la hernia. Tal teoría no se justificaba ni por los alegaciones, ni por la prueba médica que tuvo ante sí el tribunal sentenciador.

Por otro lado, el tribunal sentenciador resolvió que, no habiéndose revelado evidencia de trauma, la hernia de la cual fue operado el demandante no fue producida por la caída que éste sufriera. Para llegar a esta conclusión, descansó en la opinión pericial del Doctor D'axtmayer al efecto de que el trauma debió haberse revelado mediante hallazgos de desgarre de capilares o venitas, hemorragia, poca o mucha, e inflamación. Sostuvo el tribunal que la opinión del Doctor D'axtmayer es la más correcta y está sostenida por varias autoridades médicas que citó.([1])

---

([1]) *Courtroom Medicine* de Marshall Houts (Mathew Bender & Company, 1960), en el Capítulo 16, página 203, el Doctor David Woolfolk Barrow de Wisconsin dice sobre esto lo siguiente:

"Should swelling and bleeding into the tissues be found at operation

Sobre el tema envuelto hemos leído otras autoridades médicas que corroboran la conclusión del tribunal sentenciador. (²) La impresión que hemos recibido de esta lectura es al efecto de que la llamada hernia traumática es la excepción. Por ejemplo en el *Tratado de Medicina Legal*, Editorial Saber, Valencia, España, a la 542, se dice:

it is reasonably certain that the hernia is of recent origin."

Más adelante en la misma página y la Tabla I se dice que en la operación de hernias recientes se deben encontrar signos objetivos de trauma aguda, edema o hemorragia y que la hernia no es de origen reciente si no se encuentran estos hallazgos.

McBride, *Disability Evaluation,* 4th Ed. (J. P. Lippincott Company), pág. 604, el Doctor Earl D. McBride dice sobre los hallazgos en la operación:

"When the operation is undertaken shortly after injury there should be some signs of recent traumatic changes, such as edema or adhesions in the fascia. If a truss has been worn for several weeks, such signs will be masked. Other signs of recent ocurrence are immature fibrous bands in the sac, incarceration of abdominal fat which is only slightly adherent to the peritoneal lining and finding of recent hemorrhage or newly formed fibrous tissue on microscopic examination of the tissues. An acute strangulation usually can be quite easily traced to date of injury. Dense adhesions and a thick sac extending down to the testicle would indicate a very old condition."

(²)Véanse: Kessler, *Accidental Injuries,* The Medico Legal Aspects of Workmen's Compensation and Public Liability, Second Ed., Lea & Febiger, Philadelphia, Capítulo XIII, pág. 424. Sobre el tema de observaciones clínicas de la hernia dice el Dr. Henry H. Kessler, Director Médico de la Clínica de Rehabilitación de New Jersey: "Where an opportunity is afforded through operative measures to study the clinical pathology of the hernia, some degree of accuracy can be attained in reaching a decision. This is not so easily determined by clinical examination."

Nichols, *Trauma,* Vol. 4, Number 5, Feb., 1963 (Matthew Bender & Company), págs. 26–27, señala varios hallazgos que deben revelarse para determinar si una hernia es de origen traumático, entre otros, los hallazgos operatorios:

"The operative findings must be consistent with a recent traumatic injury. Thus, if the hernia is recent—a week old or less—one should find corroborative evidence at the operating table. There should be some extraordinary finding, such as an organized hemorrhage or an exudate, a tearing of the peritoneum, an inflamed edematous sac, or some such evidence of recent injury.

Moorhead states that he has operated on several so-called traumatic hernias, as early as a few hours after the alleged onset, but has never

"Tanto la clínica como la experimentación han conducido a una conclusión unánime: la formación de una hernia es lenta, es obra de días y días, por efecto de múltiples esfuerzos, la mayoría de ellos de leve entidad, y aun propios de las actividades ordinarias de la vida. El peritoneo podrá, al distenderse, rasgarse o estallar; nunca podrá, en virtud de un solo esfuerzo y como por acto de magia o prestidigitación, formarse el dedo de guante que moldea el intestino o contiene epiplón. Este hecho innegable y evidente es fundamental. Lo que nos lleva a concluir que la hernia de esfuerzo es tan excepcional que puede considerarse como no existente. Todas las hernias, pues, lo son de debilidad; si alguna resulta *aparentemente* originada por un esfuerzo, de lo que se trata en realidad es de la ocupación por primera vez de un saco preformado, o bien de la aparición de dolor en una hernia que había pasado inadvertida.

La única y propia hernia de esfuerzo, producida de un modo repentino como consecuencia de un esfuerzo, es la que se origina por la rotura del peritoneo parietal debida a la distensión brusca de éste. Esto, además de ser un hecho rarísimo, no constituye una hernia en el sentido médico de la palabra."

■ En su tercer señalamiento de error el recurrente muestra su inconformidad con la cuantía fijada como indemnización por daños físicos consistentes en contusiones en varias partes del cuerpo y la experiencia de haberse ensuciado de fango y materia fecal que brotaba del sistema de alcantarillado sufrida al caer. Aunque mentes razonables pueden diferir sobre la cuantía fijada como compensación por el tribunal sentenciador en este caso, no creemos que la misma sea tan irrazonablemente baja que justifique nuestra intervención para aumentarla.

*Se confirmará la sentencia dictada en 31 de agosto de 1966 por el Tribunal Superior, Sala de San Juan.*

El Juez Asociado Señor Dávila no intervino.

---

found the slightest evidence of recent pathology. He has come to the conclusion that hernias are not connected with injuries except under the most unusual circumstances."