# 97 DTA 109

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL VI DE CAGUAS, GUAYAMA Y HUMACAO

RAFAEL HERNANDEZ BARRERAS, Y LUDOVIGIA CASTRODAD MENENDEZ Y LA SOC. DE BIENES GANANCIALES COMPUESTA POR AMBOS
Demandantes-Apelantes

v.

SAN LORENZO CONSTRUCTION CORP. CONCRETO MIXTO, INC; ING. CARLOS DEL VALLE REYES, ANA GARCIA TORRES Y LA SOC. DE BIENES GANANCIALES COMPUESTA POR AMBOS; ING. RAUL ORTIZ CRUZ, LUCILA ARROYO FIGUEROA Y LA SOC. DE BIENES GANANCIALES COMPUESTA POR AMBOS; ING. HECTOR JUNCOS GAUTIER, ANA DOE Y LA SOC. DE BIENES GANANCIALES COMPUESTA POR AMBOS; INTEGRAND ASSURANCE CO; ASEGURADORA DEF, ASEGURADORA XYZ
Demandados-Apelados

JOSE FORASTIERI LIZARDI
Tercer Demandado-Apelado

Núms. KLAN-95-00545/KLAN-95-00706

San Juan, Puerto Rico, a 6 de mayo de 1997

Panel integrado por su Presidente, Juez Salas Soler y los Jueces Cabán Castro y Gierbolini

Cabán Castro, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Se apela ante nos de dos sentencias dictadas por el Tribunal de Primera Instancia, Sala de Caguas, de fechas 23 de febrero de 1995 y 28 de marzo de 1995. Ambas sentencias desestimaron sendas demandas en las que se alegó incumplimiento de contratos y vicios de construcción con relación a cuatro edificios en un Proyecto Industrial y cierto número de viviendas en un Proyecto Residencial, respectivamente. En vista de que se trataba de las mismas partes y de la similitud de las reclamaciones, el Tribunal determinó la conveniencia de consolidar los casos y así lo hizo en vista celebrada el 20 de diciembre de 1990. Posteriormente la demanda original fue enmendada en diversas ocasiones. Además, la demandada San Lorenzo Construction trajo al pleito un tercero demandado. Tres años después el demandante incluyó en el pleito a Concreto Mixto y San Lorenzo Construction presentó demanda de co-parte contra ésta. También fueron demandadas varias aseguradoras pero luego fueron eliminadas del récord a solicitud de las partes y mediante orden judicial. En esa etapa de los procedimientos, y mediante Orden del Juez Presidente del Tribunal Supremo de Puerto Rico, fechada 8 de marzo de 1994, el caso fue referido a la Unidad de Jueces de Apelaciones. Luego de ultimados los procedimientos previos al juicio, el juez de Instancia organizó la presentación de la prueba de manera que desfilara primero todo lo relacionado al Proyecto Industrial y pospuso lo relativo al Proyecto Residencial, por entender que la complejidad de las reclamaciones descansaban en el primero. Celebrado un extenso proceso que incluyó una inspección ocular de los edificios industriales, el Tribunal dictó sentencias separadas en las fechas antes indicadas.

Mediante Orden de 29 de octubre de 1996 este Tribunal ordenó la consolidación de los recursos de apelación de ambas sentencias. Procedemos a considerar en primer término la apelación correspondiente al caso Núm. KLAN-95-00545 (Proyecto Industrial) y consideraremos el Núm. KLAN-95-00706 (Proyecto Residencial) en último término.

### I

Los hechos que forman el trasfondo fáctico del caso son, en apretado resumen, los siguientes.

Rafael Hernández Barreras y su esposa, Ludovigia Castrodad Menéndez, son los dueños del Proyecto Industrial Vázquez y de los edificios objeto de este pleito. Los dueños del proyecto contrataron a San Lorenzo Construction Corp. para realizar el trabajo de movimiento de tierra *("site")* y para la construcción de los cuatro edificios industriales identificados como edificios *"A", "B", "C"* y *"D"*. La contratación está contenida en dos contratos distintos. Uno conocido como el contrato del

*"site"* por CIENTO CUARENTA Y SIETE MIL CUATROCIENTOS OCHENTA Y SEIS DOLARES ($147,486.00) y otro conocido como el contrato de *"Construction of Four Buildings"* por UN MILLON TRESCIENTOS MIL DOLARES ($1,300,000.00). El contratista se obligó a realizar todo el movimiento de tierra, las excavaciones necesarias y a compactar adecuadamente el terreno sobre el cual se construirían los edificios, así como a realizar la construcción y proveer los materiales necesarios.

Los planos y las especificaciones técnicas del proyecto requerían que los pisos de los edificios alcanzaran una resistencia de 3,000 libras de presión por pulgada cuadrada (3,000 p.s.i.) a los 28 días de vaciado el hormigón. El contratista otorgó un contrato de suplido de hormigón con Concreto Mixto para que proveyera todo el hormigón necesario para el proyecto.

Entre octubre y diciembre de 1988 se vació el hormigón de los pisos C y D, y entre febrero y abril de 1989 se realizó el vaciado de hormigón de los pisos B y A.

A principios de 1989 comenzaron a aparecer múltiples grietas en las losas de los pisos de los edificios C y D. El dueño contrató a un ingeniero para que estudiara la situación y le hiciera las recomendaciones pertinentes para corregir el problema. El ingeniero hizo algunos hallazgos que tenían relación directa con las grietas. Encontró que no se habían colocado una serie de juntas de expansión y de construcción, que no se había vaciado cemento en ciertas junturas entre el piso y las paredes y que no se habían instalado algunas otras piezas. El diseñador de los planos también intervino señalando que las juntas tenían que ser colocadas, pues su función era evitar agrietamientos del suelo.

Sin embargo, reparar las grietas del suelo hubiera requerido remover las losas de los pisos, de aproximadamente 20,000 pies cuadrados cada uno, a un costo que superaba el millón de dólares. Así las cosas, el dueño y el contratista llegaron a un acuerdo en que el segundo concedió al primero ciertos créditos por las omisiones y trabajos no realizados.

En el ínterin se habían terminado los edificios B y A, en los que también aparecieron algunas grietas. A pesar de los problemas, el dueño recibió los edificios, pagó por ellos la cantidad acordada luego de la deducción que le concedió el contratista y los arrendó a diversos inquilinos. Estos comenzaron a quejarse de algunos problemas; entre ellos, el excesivo agrietamiento de los pisos. Finalmente, el dueño y el contratista no pudieron ponerse de acuerdo sobre estos defectos y el dueño demandó por incumplimiento de contrato y vicios de construcción.

Celebrado un extenso proceso, el juez que recibió y aquilató la prueba determinó que, a pesar de haber incurrido en incumplimiento contractual, San Lorenzo Construction no era responsable de los vicios de construcción. Igualmente determinó que Concreto Mixto no era responsable de los defectos del cemento. En consecuencia desestimó la demanda contra todos los demandados. Contra dicha sentencia los apelantes plantean la comisión de los siguientes errores:

*"A. Erró el Honorable Tribunal de Instancia al resolver que San Lorenzo Construction Corp. no responde por los defectos de construcción del proyecto.*

*B. Erró el Honorable Tribunal de Instancia al omitir determinar como la fecha de recepción de la obra, la incluida en las certificaciones del contratista en los permisos de uso.*

*C. Erró el Honorable Tribunal de Instancia al resolver que los vicios por los que se reclama son vicios aparentes por lo que no existe derecho a reclamar.*

*D. Erró el Honorable Tribunal de Instancia al resolver que la doctrina de asunción de riesgo opera en este caso y exonera a la contratista de su responsabilidad bajo el artículo 1483 del Código Civil de Puerto Rico.*

*E. Erró el Honorable Tribunal de Instancia al resolver que San Lorenzo Construction Corp. transó con el dueño los daños reclamados.*

*F. Erró el Honorable Tribunal de Instancia al resolver que Concreto Mixto Inc. no es un subcontratista por lo que no responde por los defectos de construcción relacionados a la baja calidad y durabilidad del hormigón en el proyecto.*

*G. Erró el honorable Tribunal de Instancia al resolver que los Ingenieros Carlos del Valle y Raúl Ortiz no responden por los defectos de construcción en el proyecto.*

*H. Erró el Honorable Tribunal de Instancia al resolver que el Ingeniero Héctor Juncos Gautier no responde de los defectos de construcción relacionados a la baja calidad y durabilidad del hormigón en el proyecto.*

*I. Erró el Honorable Tribunal de Instancia al resolver a base de una fotografía objetada y no admitida.*

*J. Erró el Honorable Tribunal de Instancia al resolver que el apelante incurrió en temeridad."*

### -A-
### Discusión de los errores A, B, C, D, E y G

Por estar relacionados entre sí y referirse a los codemandados San Lorenzo Construction, Carlos Del Valle, Raul Ortiz y sus respectivas sociedades gananciales, se discuten conjuntamente los errores indicados.

En resumen, estos errores cuestionan la determinación de Instancia en cuanto a que San Lorenzo Construction (en adelante, SLC) no responde por los defectos del proyecto (A); que omitió determinar la fecha de recepción de la obra según los permisos de uso (B); que los vicios por los que se reclama son aparentes (C); que aplicó la doctrina de asunción de riesgo para exonerar al contratista (D); que SLC transó con el dueño los daños reclamados (E); y que los Ingenieros Del Valle y Ortiz no responden por los defectos de construcción (G).

Surge del voluminoso expediente del caso de autos que la contratista SLC y el dueño de la obra, Rafael Hernández Barreras (RHB), se obligaron mediante contrato de 12 de mayo de 1988, el primero a construir cuatro edificios y el segundo a pagar cierta cantidad de dinero. La obligación principal de SLC surge del artículo I del contrato y se lee así:

*"ARTICLE I: SCOPE OF THE WORK---------------------The CONTRACTOR shall furnish all the materials and perfonn all of the work shown on the Drawings and described in the Specifications, entitled **Construction of Four Buildings for Industrial Development for Partial "B"**.---------------------"*

Por el artículo 5 el contratista acordó lo siguiente:

*"... that he is fully informed regarding all the conditions affecting the work to be done and labor and materials to be furnished for the completion of the CONTRACT, and that he has been engaged in and knows that such work and represents that he is fully equipped, competent and capable of performing the work and is ready and willing to perform such work".------------------------".* (Subrayado nuestro)

La obligación principal del dueño era pagar al contratista la suma de un millón trescientos mil dólares ($1,300.000.00).

El contratista, pues, se obligó a proveer los materiales y realizar el trabajo según los planos y las especificaciones técnicas. Estas últimas son una extensa y muy detallada descripción de la labor a realizar, cómo realizarla, qué materiales emplear, etc. Las especificaciones técnicas describen en detalle la labor de acondicionamiento del lugar *("site")* del proyecto. Entre las labores que el contratista debió realizar para preparar el terreno donde se construirían los 4 edificios se encuentran las siguientes:

*"1. Rellenar todos los huecos o vacíos del suelo con tierra, piedra u otro material apropiado.*
*2. Proveer relleno adicional en la áreas excavadas, de ser necesario.*

*3. Rellenar y compactar la tierra bajo el suelo de los edificios.*

*4. Si el contratista excavaba el fundamento de los edificios a más profundidad de lo indicado tenía que rellenar, a sus expensas con una capa de piedra triturada y cemento de 3,000 psi o más.*

*5. El relleno tenía que ser colocado y compactado a fin de reducir la sedimentación y evitar daño a las paredes o a cualquier otra parte que sea a prueba de humedad o agua.*

*6. Depositar capas de relleno sobre el nivel del agua, según lo requiriera la naturaleza del suelo, pero las capas no debían exceder 8" de espesor y tenían que ser compactadas, cada una, a 95% entre las paredes estructurales de los edificios, según el método Proctor de Densidad Modificada."*

En cuanto al concreto a usarse en el piso de los edificios, las especificaciones (Divisióon 3, Section 03300) requerían del contratista:

*"1. Proveer facilidades en el proyecto para tomar muestras para pruebas y transportar a un laboratorio acreditado; si no lo hay en el proyecto, dos "set" de tres cilindros cada uno por cada 100 yardas cúbicas o por cada día de vaciado, lo que fuere menor, de cada clase de concreto tirado. Los cilindros tenían que ser probados de acuerdo con el ASTM-39, uno a los 7 días y otro a los 28 días.*

*2. El concreto debía tener a los 28 días una resistencia de 3,000 psi (promedio mínimo para tres cilindros consecutivos) o 2,700 psi (mínimo para un sólo cilindro). Si el promedio de resistencia a los 7 días tenía las relaciones de resistencia previamente señaladas, se le permitiría al contratista continuar con el trabajo.*

*3. Si las relaciones caían por debajo de lo descrito o si había duda de la calidad del concreto el contratista tenía que tomar por lo menos tres muestras de concreto y hacer que se probaran bajo el método prescrito por el ASTM C-42. Las muestras y las pruebas serían pagadas por el contratista. El mismo párrafo disponía, in fine,: "Any structural element or elements where low quality concrete has been poured, shall be demolished at the Contractor's expense, if the structural integrity is jeopardized".*

*4. La División 3, Sec. 3300, Núm. 7, establecía las proporciones de la mezcla de concreto y señalaba que no se aumentaría la cantidad máxima de agua especificada. El inciso "c" de este mismo número requería: "The proportions of each amounts of all material entering into the concrete shall be determined in accordance with the provisions of these specifications. The strength quality of the concrete proposed for use shall be established by tests made in advance of the beginning of operations, using the consistencies allowable by the maximum water content. Trial design batches and testing shall be the resposibility of the Contractor".* (Subrayado nuestro).

*5. La sec. 3300, Núm. 8, (c) requería: "Excessive mixing requiring the addition of water to preserve the required consistency, will not be permitted".*

*6. Sobre la colocación del refuerzo de varilla en la losa del piso, la sec. 3300, Núm. 10 exigía: "reinforcement shall be secured in position, before starting the pouring of concrete. Runways or other means shall be provided, for wheeled equipment to convey the concrete to the points of deposit".* (Enfasis suplido).

*7. La sec. 3300, 12, (c) señalaba:"Concrete slabs of grade shall be placed over well compacted subgrade.... Earth-Foundation Placements: Concrete foundation shall be placed upon undisturbed clean surfaces, free from mud, standing or running water".*

Los que anteceden son sólo algunos de los más importantes detalles que las especificaciones técnicas que se requerían del contratista como parte de su obligación contractual de construir los edificios A, B, C y D. El contratista (SLC) admitió en carta de 31 de julio de 1989 al apelante las

siguientes desviaciones de los planos y/o las especificaciones:

*"1. No vació hormigón en la Unión de pared y piso.*

*2. No instaló refuerzo en la junta de expansión de los edificios B, C, y D.*

*3. No cortó las ranuras de las losas de piso de los edificios B, C y D.*

*4. No aplicó "floor hardener" a los pisos de los edificios B, C, y D.*

*5. No se instaló "Durowall " ni varilla vertical de 3/8 en los edificios A, B, C y D.*

*6. No instaló "Rubber Bumpers " en los edificios A y B.*

*7. No se construyó el amarre entre la losa de piso y la viga perímetro.*

*8. No existe continuidad entre el piso de los edificios y las plataformas de acceso y descarga."*

*Además, la prueba tiende a indicar lo siguiente:*

*"a) El cemento de los pisos no alcanzó la resistencia requerida de 3,000 psi.*

*b) El refuerzo de los pisos (varilla) no se instaló según lo especificado en los planos.*

*c) La mezcla de cemento tenía una alta relación agua - cemento.*

*d) La losa de los pisos no tenía el espesor requerido de 5 ".*

El juez de Instancia determinó que SLC incumplió los términos especificados en el contrato de construcción, los planos y las especificaciones técnicas de los 4 edificios, lo que según el juez, ocasionó vicios de construcción. (Sentencia, Determinación de Hecho, en adelante DH, Núm. 21).

No obstante, el ilustrado juez sentenciador entendió que los daños apreciables en los edificios (grietas, filtraciones, etc.) no son imputables al contratista, sino al propio dueño y a los inquilinos de los edificios.

Para llegar a esta conclusión, el juez pareció descansar en que las especificaciones fueron sometidas al contratista luego de endurecidas las losas de los edificios C y D (DH Núm. 25); que algunas especificaciones eran ambiguas (*Id.*); que las perforaciones para el estudio de suelo no se realizaron en lugares donde finalmente descansaría la losa de los edificios y que el estudio no estableció un coeficiente de balasto para el terreno donde descansarían las losas (DH Núm. 26); que un estudio de suelo en un área dentro del edificio D, después que la losa del piso estaba endurecida, demostró que era necesario remover 5 pies de material o relleno suelto y sustituirlo por un material selecto (*Id.*); que después de construidos los edificios se encontró evidencia de agua subterranea en el proyecto (DH Núm. 30); que algunos inquilinos impartieron cargas sobre el piso de los edificios que requerían un psi mayor que el indicado en los planos (DH Núm. 29 y 31); que en el subsuelo del edificio D se detectó presencia de material de relleno suelto, traído por aluvión de rio (DH Núm. 32); que las grietas del suelo en los edificios no se debe a retracción del concreto, sino a movimientos de suelo (DH Núm. 33); que las grietas de los edificios son productos de problemas de diseño (DH Núm. 50); que el dueño conocía la omisión de ciertos trabajos o de la instalación de ciertas piezas y que a pesar de ello recibió la obra, por lo que asumió los riesgos (DH Núm. 16, 17 y 19).

Estamos conscientes de que en ausencia de error manifiesto, pasión, prejuicio o parcialidad los tribunales revisores no deben intervenir con la apreciación de la prueba hecha por los tribunales de instancia. *Elba A.B. v. U.P.R.,* 125 D.P.R. 294 (1990); *Rodríguez Cruz v. Padilla Ayala,* 125 D.P.R. 486 (1990). Sin embargo, una apreciación errónea de la prueba por un tribunal de instancia no tiene credenciales de inmunidad frente a un tribunal revisor; este puede alterar una conclusión de hecho que no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba. *Cárdenas Maxán v. Rodríguez,* 125 D.P.R. 702 (1990); *Santiago Otero v. Méndez,* 135 D.P R. ___ (1994),

opinión de 25 de marzo de 1994; **94 J.T.S. 38.** Un minucioso y concienzudo examen integral de los autos nos lleva a concluir que instancia incidió en la apreciación y valoración de la prueba.

Como señaláramos anteriormente, el contratista se obligo con el dueño a suplir los materiales y construir los 4 edificios. Estipuló que estaba completamente informado sobre todas las condiciones relativas al trabajo a realizar y a los materiales que debía suplir para cumplir su parte en el contrato. Es natural que así fuera, pues SLC es una empresa dedicada al negocio de la construcción, por lo que se supone tenga la *pertia artis* en este ramo. El hecho de que haya recibido las especificaciones técnicas después de haberse tirado los pisos de dos edificios no juega ningún papel en la relación contractual entre las partes. Ello podría tener alguna consecuencia para la relación entre el dueño y el Estado (que aprueba las especificaciones) o entre el contratista y el Estado (que tiene facultad para regular el negocio de la construcción). Entre las partes, en cambio, no puede decirse que la ausencia de aprobación por ARPE le restara valor a las especificaciones. Aun si realmente desconocía las especificaciones, cosa que no se demostró y que dudamos, el contratista estipuló qué conocía todas las condiciones que afectaban el trabajo a realizar y los materiales necesarios a usarse. Si aceptáramos que no conocía las estipulaciones hasta que ARPE las aprobó, tendríamos que concluir que SLC incurrió en falsa representación contractual.

Por otro lado, ¿cómo podríamos librar de responsabilidad a un constructor que emprende una obra a ciegas, sin conocer los detalles técnicos que requiere la misma?

Discrepamos de instancia en cuanto a la supuesta ambiguedad de las especificaciones sobre las proporciones para la mezcla del concreto (Tech. Spec., Div. 3, Sec. 3300, Núm.7). Allí se indican ciertas cantidades de cemento en sacos y libras y ciertas cantidades de agua en galones y libras. La ambiguedad consiste, según instancia, en que no se indica si dichas cantidades son máximas o mínimas. Las proporciones especificadas no son ni máximas ni mínimas, son justamente las que se indican, no otras mayores ni menores. No hay en ello ambiguedad alguna, sino lo contrario: precisión. Si algo nos llamó la atención en las especificaciones técnicas es que son bizantinamente detalladas.

Sobre el estudio de suelo, instancia determinó, como base para la responsabilidad del dueño y no del contratista, que las perforaciones realizadas por la firma que hizo el estudio de suelo no se efectuaron en lugares donde finalmente descansaría la losa del piso de los edificios. Encontramos en los autos que la realidad es otra. El estudio de suelo contiene entre sus apéndices un mapa de la localización de las perforaciones *("Borings Location Map")*. Del mismo se desprende que las perforaciones 41 y Núm. 2 quedaron bajo el piso del edificio A; la perforación Núm. 4 quedó bajo el edificio B; la Núm. 6 quedó bajo el edificio C y las perforaciones Núm. 8 y 9 quedaron bajo el edificio D. Sólo tres perforaciones (las número 3, 5 y 7) quedaron fuera de los pisos, pero se encuentran entre los edificios a muy poca distancia de uno y otro. Si bien es correcta la determinación de instancia en el sentido de que el estudio de suelo no estableció un coeficiente de balasto (capa de piedra o gravilla que se extiende y compacta contra el suelo antes de echar el pavimento) no es menos cierto que el dicho estudio señalaba la necesidad de compactar el terreno donde se asentarían los edificios a 90% según el método Proctor de Densidad Modificada.

Por otra parte, el estudio de suelo tiene como propósito conocer la capacidad del terreno para soportar la carga de la construcción, mientras que el coeficiente de balasto es un factor que deben establecer ingenieros y arquitectos, en su función técnica de proveer un basamento sólido y firme para la construcción. No corresponde al personal técnico que hace el estudio de suelo establecer un coeficiente de balasto, pues este depende no sólo de las condiciones del terreno sino del tipo de construcción que se proponga levantar sobre él y de las cargas del edificio, consideraciones éstas que están fuera del alcance del personal geotécnico.

En cuanto al estudio de suelo realizado en el edificio D después que el piso estaba endurecido, el cual reveló la existencia de material de relleno suelto que debía ser sustituido, baste decir que era responsabilidad del contratista compactar el terreno sobre el que descansaría la losa del piso. En nada cambia esa responsabilidad el hecho de que el material suelto no fuera colocado por el contratista, alegando que en ese área lo que requería el plano era corte y no relleno, pues la especificaciones, que requerían compactación del suelo bajo la losa en un 95% según el Método Proctor (5% más que lo recomendado por el estudio de suelo), no distinguen entre corte y relleno para propósitos de la

compactación del suelo. (Véase Tech. Spec., *supra*). También los planos (pág. S-2) requerían compactación del suelo sobre el que descansarían las losas en un 95%.

El juez de instancia entendió que las grietas en los pisos de cemento, por lo menos en el edificio C, se produjeron por movimientos del suelo. Sin embargo, era responsabilidad del contratista compactar adecuadamente el suelo. Además, el contratista no se libra de responsabilidad por el hecho de que quien escoja el lugar para construir sea el dueño, o por que éste le requiera que construya en un lugar dado, pues el interés público le requiera que se niegue a construir si las condiciones del suelo no son apropiadas. *González v. Agostini,* 79 D.P.R. 510 (1956). Si lo construido sufre daños por movimientos del suelo no debidos a terremotos o fallas geológicas desconocidas, la responsabilidad es entonces del contratista o arquitecto, según sea el caso.

También señaló la sentencia apelada que las grietas son producto, en parte, de problemas de diseño, pues el plano no provee relleno en las juntas de construcción ni de expansión a fin de proteger los bordes de las juntas. Un vistazo a la página S-2 de los Planos revela que dicha determinación es incorrecta. El detalle de la junta de construcción en las líneas 2, 3, 4, 6, 7 y 8, así como en las líneas A1, B y C1, provee para la colocación de una franja de polietileno a todo lo largo de las líneas. Igualmente, el detalle de la junta de expansión en la línea 5, además de la franja de polietileno, indica que las ranuras de 5/8" en la junta se deben rellenar con material bituminoso (Bitumastic Expansion Filler).

Por lo que llevamos dicho va quedando claro que el tribunal *a quo* incidió al resolver que San Lorenzo Construction Corp. no responde por algunos de los vicios de construcción en algunos de los edificios. Concurrimos plenamente con el juez de instancia en cuanto a que SLC incumplió con los términos especificados en el contrato, planos y especificaciones técnicas, lo que ocasionó vicios de construcción. (Determinación de Hechos Núm. 21). Sin embargo, discrepamos acerca de las varias causas que se ofrecen para explicar el excesivo agrietamiento de algunos pisos, todas las cuales exoneran de responsabilidad al contratista. Nuestro análisis independiente, a base de las constancias del expediente, nos lleva a concluir que los defectos de la construcción se deben al incumplimiento de algunas especificaciones técnicas que el contratista se obligó a cumplir. La evidencia apunta a una pobre compactación del suelo sobre el cual descansan los pisos de los edificios; a la omisión de instalar ciertas piezas o materiales y a problemas en la calidad y/o las proporciones del cemento. (Las últimas dos causas apuntadas se discuten más adelante, a propósito de otros errores alegados por el apelante).

*"La responsabilidad de un contratista, de mediar vicios de construcción, es directa y primaria".* *Meléndez v. Levitt and Sons of P.R.,* 104 D.P.R. 797, 814 (1976), y casos allí citados.

A pesar de determinar que el contratista incumplió parte de sus obligaciones, lo cual ocasionó vicios de construcción, el juez sentenciador lo eximió de responsabilidad porque: a) el dueño de la obra negoció y transó con el contratista por ciertas labores no realizadas o piezas no instaladas, por lo que el contratista le dio un crédito al dueño (DH Núm. 17); b) al transar las omisiones el dueño relevó de responsabilidad al contratista (DH Núm. 19); c) el dueño, conociendo las omisiones en la construcción, aceptó la obra, por lo que asumió los riesgos (DH Núm. 19); d) los defectos por los que reclama el dueño son vicios aparentes, por lo que no tiene derecho a recobrar (DH Núm. 16, 17, 19 y 46). Notamos que algunas de estas determinaciones son cuestiones combinadas de hechos y de derecho. Concurrimos con lo relativo a los hechos, más no así con lo relativo al derecho.

Es correcto que el contratista y el dueño se involucraron en una negociación sobre las omisiones y desviaciones de los planos. El acuerdo final consistió en la concesión de un crédito que el contratista daría al dueño por la omisión de instalar las juntas de construcción, juntas de expansión y de hacer las ranuras en el piso de los edificios B, C, y D. En carta fechada 31 de julio de 1989, Carlos del Valle, Presidente de SLC, notificó al dueño los renglones por los que le concedería crédito (Apen. pág. 198). El crédito concedido no incluyó defectos del cemento, ni las grietas que habían comenzado a aparecer en los edificios C y D, ni la pobre compactación del suelo, ni la incorrecta instalación del refuerzo del concreto (varilla), ni la disminución en el espesor de las losas. Estos defectos, que en el juicio levantó el dueño como causas principales de los defectos de construcción, no se incluyeron por la simple razón de que no eran conocidos entonces, excepto las grietas cuya causa se conoció bastante después.

Por lo tanto, no cabe concluir que el apelante no pueda recobrar por todos o algunos de los defectos indicados, pues ellos no formaron parte de la negociación.

Por otro lado, debemos señalar que dicha negociación no fue otra cosa sino el ejercicio de la acción *quanti minoris* que el artículo 1375 del Código Civil, 31 L.P.R.A. § 3843, le reconoce a un comprador de cosa mueble o inmueble. La acción estimatoria, o *quanti minoris*, es aquella en que el comprador deja la venta subsistente, pero recobra parte del precio entregado o pide que le sea entregada aquella parte del precio que pagó indebidamente, dada la disminución del valor de la cosa que suponen los vicios advertidos en ella. *Boyd v. Tribunal Superior,* 101 D.P.R. 651 (1973).

En cuanto a los defectos no incluidos en la negociación, la responsabilidad del contratista dependerá de que los mismos constituyan *"vicios de construcción"*, cuestión que habremos de abordar más adelante.

En estricto sentido jurídico, no hubo una transacción. El Código Civil define el contrato de transacción como aquel *"por el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, **evitan la provocación de un pleito** o ponen término al que había comenzado"*. (Subrayado nuestro) Art. 1709, 31 L.P.R.A. § 4821. Si luego de una supuesta transacción sobreviene el pleito que las partes quisieron evitar, es evidente que no hubo tal transacción, pues de haberla habido y ser válida el demandante estaría impedido de levantar reclamación alguna. Además, una transacción sobre vicios de construcción, en el contexto del artículo 1709, *supra*, equivaldría a una renuncia a la acción decenal, lo cual es radicalmente nulo. *González v. Agostini,* 79 D.P.R. 510 (1956). El dueño de la obra, por supuesto, no tiene derecho a recobrar en juicio por las piezas no instaladas ni la mano de obra no invertida por las que recibió crédito del contratista. Cosa distinta es reclamar por la ruina que pudieran causar esas u otras omisiones o alteraciones del contratista. Sobre las primeras queda el contratista relevado como defectos específicos, más no queda relevado si éstos son causa de la ruina, pues de esta responsabilidad sólo se libra por el transcurso de (diez) 10 años. Código Civil, art. 1483, 31 L.P.R.A. Sec. 4124.

El juez de instancia resolvió que el dueño asumió los riegos al aceptar la obra conociendo las omisiones del contratista a los planos y especificaciones. Basa su juicio en una indicación que hiciera el Ing. Forastieri, quien evaluó y estimó los daños a petición del dueño, en el sentido de que *"quedaba por evaluar el riesgo que asumiría por las omisiones"*. (Sentencia, pág. 15). El juez entendió que el dueño aceptó la obra *"con las advertencias de riesgos que las omisiones podrían causar"*. La aseveración del Ing. Forastieri, sin embargo, lo que señala es que el riesgo no se evaluó, sino que *"quedaba por evaluar"* ese aspecto. Por tanto, podía haber una noción general de riesgo, pero no se conocía la magnitud del mismo. Más aún conociéndola, la asunción de riesgo no puede derrotar una norma basada en el interés y la seguridad pública.

La defensa de asunción de riesgo, proveniente del Derecho Común anglosajón, se clasifica bajo dos amplias categorías: (1) asunción implícita por razón de la conducta del demandante y (2) asunción de riesgo por acuerdo o contrato. La primera categoría quedó incluida en el concepto de *"imprudencia concurrente"* de la última oración del artículo 1802 del Código Civil, 31 L.P.R.A. § 5141, cuando la Ley Núm. 28 de 9 de julio de 1956 enmendó dicho artículo para que leyera: *"La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización"*. Así, pues, la asunción de riesgo en el ámbito extracontractual no tiene existencia propia, sino que se pondera como negligencia concurrente o contribuyente dentro de la doctrina de negligencia comparada. Herminio Brau Del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico,* Segunda Ed., **Publicaciones JTS**, San Juan, 1986, Vol. I, págs. 409-410. En cuanto a la segunda categoría, la asunción de riesgo surge de la relación entre demandado y demandante derivada de un acuerdo o contrato, como es el caso de las *"exculpatory clauses"* en los boletos de trenes y de aviones. Sobre esta categoría informa Brau Del Toro:

*"Se exige que se establezca que el contrato contenía tal cláusula y que el demandante estaba consciente de ella o debía razonablemente estarlo, y que la aceptó. La posición de negociación deberá ser razonablemente pareja. Si el demandante no tuviera otra alternativa, no aplica la defensa. **Tampoco aplica la defensa si el convenio es contrario a la política pública de la jurisdicción."*** (Subrayado nuestro) Herminio Brau Del Toro, *supra*, pág. 410.

En este caso no había ninguna cláusula sobre riesgos y, de haberla habido, la defensa sería inaplicable, pues la política pública en Puerto Rico, que impide la renuncia a la acción decenal por vicios de construcción, *González v. Agostini, supra*, no podría permitir la asunción de riesgo como una defensa que libere de responsabilidad al contratista. El mismo principio de orden público que impide la renuncia, impide una defensa que conlleve la imposibilidad de ejercitar la acción. Por tanto, no podemos sostener que el dueño asumió los riesgos al aceptar la obra.

Sobre la aceptación misma de la obra, el récord es un tanto conflictivo. El juez sentenciador omitió señalar una fecha específica para la recepción, limitándose a indicar que *"en o alrededor del 10 de julio de 1989, el Ing. Forastieri le recomendó ("al dueño") aceptar la obra por estar sustancialmente completada."* El demandante aceptó la obra con los señalamientos que de las juntas se hicieron y las advertencias de riesgos que las omisiones relacionadas podrían causar. (Sent., DH Núm. 16). No está claro si la aceptación se produjo en la misma fecha de la recomendación.

Por otro lado, los permisos de uso concedidos por ARPE fueron aprobados entre enero y mayo de 1989. Los edificios D, C y B fueron ocupados por distintos arrendadores en enero, febrero y julio de 1989, respectivamente; el edificio A fue arrendado en marzo de 1991. El apelante levantó como error que Instancia omitiera determinar como fecha de recepción la incluida en las certificaciones del contratista en los permisos de uso (diciembre 1988 y mayo 1989). No tiene razón el apelante. La certificación del contratista a lo que se dirige es a dar fe de que la obra fue construida según los planos y el permiso de construcción concedido por ARPE. De dicha certificación no se desprende directa ni indirectamente que la obra haya sido recibida y aceptada. Creemos más bien que los edificios fueron aceptados en las fechas en que fueron arrendados, según indicadas más arriba. En ese momento el dueño, ejerciendo sus facultades *de domine*, comenzó a percibir los frutos de los edificios. La aceptación formal posterior, en o alrededor del 10 de julio de 1989, sólo fue una ratificación de la aceptación que ya se había producido como cuestión de hecho. Réstanos por resolver, en cuanto a los errores relativos a SLC, la calificación que debemos dar a los defectos o vicios de construcción alegados y probados.

La doctrina y la jurisprudencia han ido ensanchando a través de los años el vocablo *"ruina"* empleado en el artículo 1483 del Código Civil, 31 L.P.R.A. § 4124. La ruina no tiene que afectar la subsistencia de la construcción. Scaevola, *Código Civil,* 2da. ed., Madrid, 1951, T. XXIV, Vol II, pág. 97. La responsabilidad decenal cubre no sólo la ruina actual, sino también la amenaza o peligro de ruina. J. Cadarso Palau, La responsabilidad decenal de arquitectos y constructores, Madrid, Ed. Montecorvo, 1976, pág. 127. La responsabilidad del contratista no se limita al caso de la ruina total de lo edificado; es responsable también de la ruina parcial. *Géigel v. Mariani,* 85 D.P.R. 46 (1962). También se ha extendido la responsabilidad del contratista a la llamada ruina funcional.

Se han elaborado algunos criterios para determinar la existencia de ruina funcional. Los vicios de construcción a) deben causarle perjuicio considerable al propietario; o b) deben comprometer la seguridad pública; o c) deben tornar la obra en impropia para el uso a que se le iba a destinar; o d) deben exceder la medida de las imperfecciones que cabe esperar en una construcción. *Federal Ins. Co. v. Dresser Ind. Inc.,* 111 D.P.R. 96, 103 (1981).

El grado de agrietamiento que muestran los mapas de grietas que obran en el expediente refleja que, por lo menos, estamos ante un defecto que excede la medida de las imperfecciones que cabe esperar en una construcción. El juez de instancia resolvió que la obra fue aceptada con el conocimiento de ciertas omisiones y a pesar de que el principal vicio alegado, las grietas, eran defectos aparentes

En consecuencia, determinó, siguiendo a *González v. Agostini, supra*, que el dueño no tenía derecho a reclamar por aquellos vicios o defectos que eran aparentes. El caso de autos es distinguible. En aquél se alegaron *"defectos y deficiencias"* conocidas desde que se entregó y aceptó la obra. En éste, en cambio, lo que se conocía al aceptar la obra era un síntoma de los vicios de construcción, pues las grietas son consecuencia de dichos vicios, no el vicio mismo.

En la formación de las grietas colaboró la ausencia de juntas de construcción y de expansión, defecto conocido antes de la recepción de la obra. Pero no fue esa la única ni principal causa del

defecto alegado. La deficiente colocación de la malla de refuerzo y problemas intrínsecos del hormigón utilizado en los pisos, fueron causas principales del agrietamiento de las losas. Estos defectos no eran aparentes. Lo que el dueño conocía, las grietas, era sólo una manifestación de los vicios.

Podría señalarse que el dueño aceptó mediante negociación que no se colocaran las juntas de construcción y de expansión, por lo que conocía una de las omisiones causantes del daño. Dicho argumento no puede utilizarse para relevar de responsabilidad decenal al contratista porque, estando su actividad sujeta a la seguridad y el orden público, no puede éste *"negociar"* aspectos de la construcción que comprometan la solidez, estabilidad o finalidad de la obra. Este es el mismo razonamiento que subyace en la doctrina y la jurisprudencia con relación a la responsabilidad del contratista o del arquitecto cuando el vicio proviene del suelo. En tal caso hay responsabilidad aunque se haya dado aviso oportuno al propietario, *"pues su deber en tal caso es no seguir las indicaciones de éste, sino resistirse a hacer la obra porque el interés público así lo exige."* 10 Manresa, Vol. II, págs. 705-716; Puig Peña, *Derecho Civil*, Tomo IV, Vol. II, pág. 307; *González v. Agostini, supra.* El contratista no puede pactar con el dueño, ni seguir sus indicaciones, en aspectos que comprometan la seguridad y el orden público. Identificado el problema de la ausencia de las juntas, el contratista debió corregir el defecto. Una negociación al respecto tendría el efecto de relevar al contratista de su responsabilidad decenal y sería una manera de *"darle la vuelta"* a la norma que declara nulo dicho pacto.

Por otra parte, concurrimos plenamente con lo expresado por Vélez Torres sobre el particular, citando a Cadarso Palau:

*"Conforme a la opinión dominante en Francia,... la recepción y aceptación sin reservas por parte del comitente exoneran de responsabilidad a los constructores por lo que se refiere a los vicios aparentes, aunque éstos afecten la solidez de la obra o los elementos esenciales. Solución que resulta inadmisible para quienes invocan, como principio informador del régimen de la responsabilidad decenal, el interés por la seguridad pública: la salvaguarda de la misma no puede quedar pendiente de los azares psicológicos de un acto, la recepción, que sólo tiene lugar entre el propietario (a quien no se le puede reconocer la posibilidad de derogar un regla de orden público) y el constructor."* (Cita omitida).

Añade este autor --sigue diciendo Vélez Torres-- que ante los vicios aparentes hay que tener en cuenta el hecho de que, muchas veces, en el momento de la recepción de la obra pueden aparecer vicios aparentes que, con el tiempo, pueden tener como consecuencia la ruina de la misma, sin que el dueño pueda estar consciente de este hecho. En tal caso, ¿debe considerarse renunciada la garantía por el vicio aparente que eventualmente podría ocasionar la ruina de la obra, por el sólo hecho de que el dueño la acepta y recibe? Y, citando un pasaje de Mazeud:

*"A los vicios ocultos propiamente dichos, es decir, desconocidos por el dueño al momento de la recepción, hay que asimilar los defectos que el dueño ha descubierto en el momento de la recepción, pero sin poder conocer las consecuencias dañosas que en el futuro podrían producir. Las razones para mantener la responsabilidad del empresario son, en efecto, las mismas en ambas situaciones. Tanto en uno como en otro se puede hablar de vicio oculto latu sensu".* (Cita omitida).

A la anterior exposición concluye nuestro tratadista:

*"Si resumimos, pues, la moderna doctrina con relación a la responsabilidad del contratista por vicios aparentes, podemos afirmar que por el hecho de que un vicio se considere aparente, este no queda automáticamente renunciado con la consecuencia de liberar al contratista de la responsabilidad que pueda ocasionar, en el tiempo, dicho vicio aparente; es decir, un vicio aparente que pueda, en el futuro, ser la causa de la ruina de un edificio, no puede considerarse renunciado por el dueño por el hecho de que éste acepte la obra a pesar de que se dio cuenta a tiempo de la existencia del mismo."* José Ramón Vélez Torres, *Curso de derecho civil,* Tomo IV, Vol. II, Rev. Jur. UPR, San Juan, 1990, págs. 351-352.

Por lo expuesto podemos concluir que se cometió error al resolver: a) que San Lorenzo

Construction no responde por los defectos de construcción del proyecto; b) que los vicios por los que se reclama son aparentes, por lo que no existe derecho a recobrar; c) que la doctrina de asunción de riesgo opera en este caso y a base de ella se exonera al contratista; y d) que San Lorenzo Construction transó con el dueño los daños reclamados. En su lugar, resolvemos: a) que San Lorenzo Construction responde directa y primariamente por los defectos de la construcción; b) que los vicios no eran aparentes y, aun de serlo, tal vicio no releva de responsabilidad al contratista si el mismo es causa de la ruina dentro del plazo decenal; c) que la doctrina de asunción de riesgo no es aplicable en este caso y la misma no puede usarse para relevar de su responsabilidad decenal al contratista; y d) que la negociación habida entre las partes no incluyó los vicios reclamados en esta demanda. El dueño sólo recibió el descuento a que tenía derecho por piezas no instaladas y labor no realizada. En cuanto al error relativo a la fecha de la recepción de la obra, resolvemos que no se cometió dicho error. El sexto error apuntado por el apelante se refiere a la exoneración de responsabilidad de los Ingenieros Carlos Del Valle, Presidente de SLC, y de Raúl Ortiz, quien trabaja para la misma corporación. Sabido es que una corporación tiene personalidad jurídica independiente de sus accionistas. *Cruz v. Ramírez,* 75 D.P.R. 947 (1954). Una de las más importantes implicaciones de que la corporación tenga personalidad jurídica propia es la doctrina de la responsabilidad limitada. De acuerdo con esta, los accionistas de la corporación están, de ordinario, separados de la corporación en cuanto a responsabilidad se refiere. Si los bienes de la corporación no alcanzan para satisfacer una deuda, sentencia o pago, no se puede ir contra los bienes privados de los accionistas a cobrar o hacer efectiva la diferencia no satisfecha. Tampoco la responsabilidad de la corporación es compartida con sus accionistas, es decir, no existe responsabilidad solidaria ni mancomunada entre los accionistas y la corporación. Luis Mariano Negrón Portillo, *Derecho corporativo puertorriqueño,* 1995, págs. 9-11.

La responsabilidad limitada no es un principio absoluto, pues en situaciones justificadas se puede *"descorrer el velo corporativo".* Sin embargo, *"como regla general se respetará la personalidad jurídica de las corporaciones, a menos que haya razón suficiente que justifique hacer lo contrario". South P.R. Sugar Corp. v. Junta Azucarera,* 88 D.P.R. 43 (1963).

San Lorenzo Construction Corporation es una corporación organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico, dedicada al negocio de la construcción. Carlos Del Valle es su Presidente y, por lo tanto, accionista protegido por el principio de responsabilidad limitada de que gozan las corporaciones. En consecuencia, debemos resolver que el Ingeniero Carlos Del Valle no responde personalmente al apelante por los defectos de la construcción.

En cuanto al Ingeniero Raúl Ortiz, empleado de la SLC, tampoco debe responder personalmente por los defectos del proyecto, pues como empleado de la corporación, ésta es su patrono y él está protegido por la responsabilidad vicaria que impone el artículo 1803 del Código Civil, 31 L.P.R.A. § 5142.

## -B-
### Discusión de los errores F y H

Por estar relacionados entre sí y referirse a los co-demandados Concreto Mixto, Héctor Juncos Gautier y su sociedad legal de gananciales, se discuten conjuntamente los errores F y H.

En ellos se imputa al tribunal de instancia haber errado al resolver que Concreto Mixto no es subcontratista, por lo que no responde por los defectos de construcción relacionados a la baja calidad y durabilidad del hormigón en el proyecto, como tampoco responde por ello el Ing. Héctor Juncos Gautier.

No tenemos dudas de que Concreto Mixto es un suplidor y no un subcontratista. Estuvo en lo correcto el juez de Instancia al distinguir entre un subcontratista y un suplidor caracterizando a aquél como el que se obliga a ejecutar parcial o totalmente la obra; obligación que puede incluir secundariamente el suplido de los materiales. El suplidor, en cambio, no construye parte alguna de la obra, sino que se limita a proveer ciertos materiales. Con el suplidor no se hace un contrato de obra, sino de compraventa y, por tanto, no le aplica la responsabilidad decenal. *Carreras v. González Santos,* 111 D.P.R. 819, 822 (1981). Bajo este enfoque, pues, Concreto Mixto no debe responder por los defectos del proyecto de construcción.

Sin embargo, Concreto Mixto, luego de ser traído al pleito, fue demandado como co-parte por SLC. Tomamos conocimiento judicial de que en el expediente del caso Núm. KLCE-95-00624, secuela de este caso en que se litiga la cuantía de las costas y gastos de este pleito, figura copia de la *"Demanda de Co-Parte"*, fechada 19 de agosto de 1993, de SLC contra Concreto Mixto. Tras incorporar por referencia algunas de las alegaciones del demandante, SLC alegó en ella que *"de probar la parte demandante la veracidad de las alegaciones a las que hemos hecho referencia, procedería dictar sentencia en contra de los demandados Concreto Mixto Inc., Héctor Juncos Gautier, Ana Doe y la Sociedad Legal de Gananciales compuesta por ambos, condenándole a indemnizar a la parte demandante por los alegados daños sufridos según los probase en su día"*. Alegó, además, que *"de tener la parte aquí compareciente [SLC] que indemnizar a la parte demandante por los alegados daños, los demandados de co-parte vendrían obligados en virtud de los hechos probados, a reembolsarle a los aquí comparecientes toda aquella cantidad en acorde con los respectivos grados de negligencia, si alguna, de las partes"*.

La Regla 11.7 de las de Procedimiento Civil, 32 L.P.R.A., Ap. III, dispone:

*"Una demanda contra co-parte podrá contener cualquier reclamación que surja del acto, omisión o evento que motive la demanda original, o de una reconvención en el pleito, o que esté relacionada con cualquier propiedad que constituya objeto de la demanda original. La referida demanda contra co-parte podrá contener una reclamación al efecto de que **la parte contra la cual se dirige es, o puede ser, responsable al demandante contra co-parte de la totalidad o de parte de una reclamación contra él**, alegada en el pleito"*. (Enfasis suplido).

La regla permite la presentación de una reclamación de un co-demandado a otro para que el demandado de co-parte responda al demandante contra co-parte por toda o parte de la reclamación contra él. La demanda de co-parte es una reclamación contingente, pues depende de que el demandante original pruebe sus alegaciones contra el demandado-demandante contra co-parte para que entonces el demandado de co-parte deba responder. En este caso, SLC dedujo demanda de co-parte contra Concreto Mixto e hizo la alegación permitida por la citada Regla 11.7. Es irrelevante la calificación que como subcontratista o suplidor demos a Concreto Mixto, pues su vinculación al pleito no se basa en ello, sino en la reclamación que le hace un co-demandado que es a la vez parte en un contrato con Concreto Mixto. En virtud de ello, Concreto Mixto queda vinculada al pleito y debe responder si determinamos que hay alguna relación entre los defectos alegados y el hormigón servido por la concretera.

Está claro que Concreto Mixto no conocía ni tenía porqué conocer las especificaciones técnicas y los planos del proyecto para el cual sirvió el hormigón. Su responsabilidad, si alguna, sólo puede surgir por el incumplimiento de alguna de sus obligaciones contractuales en su relación con SLC, con quien tenía un contrato de suplido de hormigón, y por virtud de la demanda de co-parte que instara en su contra San Lorenzo Construction. Entre las obligaciones de Concreto Mixto estaban la de proveer dos mil (2,000) yardas de hormigón capaz de alcanzar una resistencia de tres mil (3,000) libras de presión por pulgada cuadrada (3,000 psi).

La prueba no refutada demuestra que estudios de laboratorio determinaron que la mezcla tenía una alta proporción de agua. El estudio de laboratorio demostró que el *"ratio"* agua-cemento era de 0.76 para el diseño de mezcla 320 ó 0.78 para el diseño de mezcla 300. Estas relaciones se consideran inaceptables para un concreto cuya resistencia en compresión a los 28 días debe ser de 3,000 p.s.i. El exceso de agua en la mezcla hace que ésta alcance un menor grado de resistencia cuando el hormigón se endurece. Descartamos la repetida conclusión de instancia en el sentido de que lo ordenado fue hormigón de 3,000 p.s.i., sin especificar una determinada relación agua-cemento. El pedido de hormigón de 3,000 p.s.i. lleva implícita una específica relación agua-cemento que Concreto Mixto, experto en este ramo, debía conocer. Prueba de ello es que, sin que se le pidiera, en el diseño de mezcla se incluyó una relación agua-cemento.

Tampoco fue contradicho el hecho de que se agregó a la mezcla más cantidad de cemento de la requerida. Un exceso en la cantidad de cemento genera mayor calor en el proceso químico de la mezcla, produciendo mayor encogimiento del cemento cuando éste se seca. Este encogimiento o retracción produce que el cemento se agriete. La cantidad de agua que se agrega a la mezcla de

cemento tiene que tomar en cuenta el grado de humedad de la arena y la piedra. Es práctica común que las concreteras realicen pruebas de humedad dos veces al día, ya que estos materiales se mantienen a la intemperie. No fue contradicha la prueba al respecto de que Concreto Mixto no realizó pruebas de humedad en la arena y la piedra usadas para la mezcla, aunque en esos días se reportaron aguaceros en el lugar donde la arena estaba colocada.

En el proyecto se utilizaron dos clases de mezcla de cemento: la denominada 300 y la 320. Concreto Mixto preparó y envió el diseño de la mezcla 300 a principios de diciembre de 1988. El vaciado de hormigón en el piso del edificio D se término el 7 de noviembre de 1988 y en el edificio C, el 18 de noviembre de 1988. (Estipulación Núm. 1) El diseño de mezcla 320 se preparó y envió en marzo de 1993, casi cuatro años después de concluido el trabajo. Por tanto, el diseño de mezcla 300 se preparó y envió después de realizada la mitad del trabajo, cuando ya no era posible hacer ajustes en el diseño si se detectaba que algo estaba mal. Para efectos prácticos, el diseño de mezcla 320 nunca se preparó ni envió, pues llegó casi cuatro años después de concluido el vaciado de hormigón. Concreto Mixto no presentó prueba para contradecir el testimonio del Ing. Guevara en el sentido de que el diseño de mezcla 320 tenía una alta proporción de arena con relación a la cantidad de piedra, lo que Guevara comprobó visualmente cuando el perito de SLC repicó parte de la losa de un piso y él observó un alto contenido de arena.

En el contrato con SLC, Concreto Mixto asumió, entre otras, la siguiente obligación: *"The strength of the concrete is guaranteed by the Supplier.* **The proportions shall be established by the Supplier and shall be such to meet the requirements of strength evaluation of the latest editions of the A.S.T.M. C-94 or the A.C.I.-318 for Working Stress or Ultimate Strength Types Concrete".** *(Cláusula 7); "The Purchaser reserves de right, at his expense, to install his representative at the loading plant of the Supplier and to check the design, testing, inspection and loading of the materials covered by this Contract".* (Cláusula 12). (Énfasis nuestro).

Concreto Mixto garantizó la resistencia del cemento y se obligó a establecer proporciones que cumplieran con los requisitos del ASTM y del ACI. La prueba no contradicha demuestra que no satisfizo esa obligación. En la cláusula 12 está implícita la preparación de un diseño que el comprador tenía derecho, a su opción, de cotejar. Aunque lo hubiera querido, el comprador no hubiese podido cotejarlo porque el diseño de mezcla 300 se preparó cuando ya estaban echados y endurecidos los pisos de los edificios D y C y el diseño de mezcla 320 cuando todo el trabajo estaba terminado hacía varios años. El derecho concedido en el contrato aparejaba la responsabilidad de tener el diseño disponible antes de vaciar el hormigón. Sólo así hubiera podido detectarse a tiempo la alta relación de agua y el exceso de arena.

En cuanto a la resistencia del cemento de los pisos, ambas partes ordenaron pruebas periciales. Las mismas consistieron en extraer unos tarugos de cemento de los pisos, los llamados *"testigos"*, que son sometidos a pruebas de compresión para probar su resistencia. Las pruebas realizadas por la parte demandante demostraron que la resistencia del hormigón estaba muy por debajo de los 3,000 p.s.i. requeridos, dando como promedio 1,520 p.s.i. en el edificio B, 2,272 p.s.i. en el edificio C y 2,268 p.s.i. en el edificio D. El juez de instancia restó valor a estos hallazgos porque el diámetro de los testigos eran sólo 1/4" superior al mínimo requerido y porque los testigos se probaron húmedos en vez de probarse secos. Lo *"preferible"* era que los testigos fuesen por lo menos tres veces el tamaño del agregado grueso de la mezcla y que se prueben secos si el cemento se está usando en seco. Sin embargo, el diámetro de los testigos del demandantes estaba dentro de las medidas aceptadas. Las pruebas de resistencia realizadas por los demandados revelaron que los niveles de resistencia estaban por debajo de los 3,000 p.s.i., aunque dentro de un margen de tolerancia permitido por los códigos de construcción. Sin embargo, las muestras tomadas por el demandante se tomaron en enero de 1993 mientras las muestras del demandado se tomaron en 1994. Es conocimiento general que a mayor tiempo mayor resistencia va alcanzando el cemento. Ello explica que las muestras del demandado dieran resistencias más altas. Aún así, las mismas no alcanzaron los 3,000 p.s.i.

*"Un tribunal apelativo está en libertad de adoptar su propio criterio al evaluar la prueba pericial, quedando en igual posición que los tribunales de instancia; el foro apelativo no está obligado a seguir la opinión, juicio, conclusión o determinación de un perito o facultativo". Díaz García v. Aponte Aponte, 125 D.P.R. 1 (1989). Más aún, los tribunales tienen amplia discreción en la*

*apreciación de la prueba pericial, pudiendo adoptar su propio criterio en la apreciación y valoración de la misma, y hasta descartarla aunque resulte técnicamente correcta." Valldejuli Rodríguez v. A.A.A.,* 99 D.P.R. 917 (1971); *Concepción Guzmán v. A.F.F.,* 92 D.P.R. 488 (1965). A juicio nuestro, la prueba pericial del demandante demuestra que el cemento tenía exceso de agua, exceso de arena y que no alcanzó el grado de resistencia requerido. Estas fueron causas importantes, no necesariamente las únicas, en el agrietamiento del suelo.

Los argumentos anteriores son suficientes para establecer responsabilidad sobre Concreto Mixto. En cuanto al Ing. Héctor Juncos Gautier resolvemos que no responde personalmente, por los mismos fundamentos expuestos con relación a los ingenieros Carlos Del Valle y Raúl Ortiz.

## -C-
### Discusión de los errores I y J

Restan por adjudicar los señalamientos I y J. El primero se refiere a cierta fotografía alegadamente objetada y no admitida a base de la cual se resolvió que el refuerzo de malla de acero estaba colocado como lo requerían los planos del proyecto. Se trata de una fotografía a color que muestra cuatro losas de hormigón y al que las partes se refieren como el *"exhibit 10 de la constructora".* Obra en el expediente copia de la Minuta de 21 de noviembre de 1994, continuación del juicio en su fondo, en la que consta la presentación de dicha fotografía por la co-demandada SLC y la objeción de la parte demandante a la misma. Argumentada la objeción por la parte demandante el tribunal admitió la fotografía. Así consta en la referida Minuta: *"Se admite por el Tribunal la presentación de la fotografía en evidencia, con la objeción de la parte demandante y se marca:*

*Exhibit 10 - Fotografía a color donde se ven cuatro losas".*

Como se desprende de la cita de la minuta, dicha sentencia sí fue admitida, por lo que el error no se cometió.

El último error (J) se refiere a la imposición de temeridad al demandante. El error se cometió. La Regla 44.1 (d) de Procedimiento Civil, *supra,* autoriza al tribunal a imponer honorarios de abogado a *"cualquier parte que haya procedido con temeridad". "Aunque el concepto temeridad no está expresamente definido por esta regla, se trata de una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia. También sujeta al litigante inocente a la ordalía del proceso judicial y lo expone a gastos innecesarios y a la contratación de servicios profesionales, incluyendo abogados, con el gravamen a veces exhorbitante para su peculio". Elba A.B.M. v. U.P.R.,* 125 D.P.R. 299 (1990).

Existe temeridad cuando un litigante se defiende injustificadamente en una acción; cuando no admite francamente su responsabilidad, limitada o total; cuando se arriesga a litigar un caso del que *prima facie* se desprende su negligencia; cuando niega un hecho que le consta ser cierto. *Fernández v. San Juan Cement Co. Inc.,* 118 D.P.R. 713 (1987). Nada en la reclamación del demandante revela una actitud contumaz de querer litigar aspectos en los que claramente no tenga razón. Tampoco ha habido testarudez ni insistencia en posiciones insostenibles que revelen la actitud temeraria que sanciona la regla. El hecho de que el juez de instancia determine que el demandante no tenía razón y desestime por ello la demanda no es, por sí sólo, motivo suficiente para hacer determinación de temeridad que acarree imposición de honorarios de abogado. El examen de los autos nos ha convencido de que el demandante tenía razón en muchas de sus alegaciones. No puede haber temeridad cuando se litiga por un derecho legítimo. Concluimos, por tanto, que el demandante no incurrió en temeridad.

## II
Consideramos a continuación el recurso Núm. KLAN-95-00706.

Se trata de un pleito entre las mismas partes relacionado con un contrato de construcción de obra. Las obras en controversia son dos proyectos denominados Proyecto Comercial y Proyecto Residencial.

El apelante, Rafael Hernández Barreras, y su esposa son dueños de un predio de terreno ubicado en

el Barrio Cañabón de Caguas, Puerto Rico. Para el 26 de abril de 1988 el apelante contrató con San Lorenzo Construction, por conducto de su Presidente, Ing. Carlos Del Valle, para efectuar los trabajos de los proyectos denominados Proyecto Residencial y Proyecto Comercial. Para el primer proyecto San Lorenzo Construction se comprometió a proveer los materiales y efectuar los trabajos descritos en los planos y en el contrato conocido como *"Residential Lots Development"* a un costo de $248,065.00. Los trabajos se realizarían en el predio de terreno arriba mencionado. Los trabajos a realizarse incluian el movimiento de tierra, el acondicionamiento del terreno, preparación de la infraestructura, instalación de los sistemas pluvial, sanitario, alcantarillado y eléctrico, y la construcción de muros y verjas que delimitan las colindancias del predio. El propósito del proyecto era preparar dieciocho solares donde se construiría posteriormente una urbanización.

Para el segundo proyecto San Lorenzo Construction se comprometió a realizar el proyecto conocido como *"Mi Antojo Residential Development"* a un costo de $104,935.00. Este proyecto incluia el movimiento de tierra, el acondicionamiento del terreno, preparación de la infraestructura, instalación de los sistemas pluvial sanitario, alcantarillado y eléctrico, donde se construiría, posteriormente, un edificio para uso comercial. Los trabajos se realizarían en un predio colindante al proyecto Residencial antes descrito, también propiedad del demandante.

La entrega de ambos proyectos fue pautada para llevarse a cabo en un período de 90 días laborables luego de firmado el contrato. Además, fue estipulada la cantidad de $50.00 diarios como pena moratoria por incumplimiento o tardanza en la entrega de los proyectos.

El demandante-apelante instó acción civil en la que alegó, entre otras cosas, que el Proyecto Comercial fue entregado y aceptado el 31 de enero de 1990, un año después de la fecha pautada, por lo que la Constructora le adeuda ciertas cantidades que se detallan en la demanda. En cuanto al Proyecto Residencial, el demandante-apelante alegó que la Constructora voluntariamente y de manera unilateral decidió entregar el proyecto como final, sin haber concluido las obras objeto del contrato y con ciertas deficiencias que se detallan en la reclamación. Reclamó $18,300.00 por muros y verjas no construidos y $24,250.00 por no haberse terminado el proyecto.

En cuanto al Proyecto Residencial, el tribunal de instancia resolvió que el retraso en la entrega de la obra se debió a problemas confrontados con las colindancias del predio donde se trabajaba y al hallazgo de material inestable en el suelo, todo lo cual provocó cambio de órdenes de trabajo. Entendió el tribunal que estas fueron situaciones imprevistas para el Contratista, y que de acuerdo a la jurisprudencia del Tribunal Supremo, el contratista era acreedor a una extensión del término para finalizar la obra pactada. En consecuencia, resolvió que el contratista no adeudaba cantidad alguna por mora.

Sobre el proyecto Comercial, el tribunal de instancia resolvió que el contratista entregó la obra en un momento en que estaba completada el 87% de la misma, por lo que consideró que la entrega se hizo cuando el trabajo estaba sustancialmente completado *("substancially completed")*. No obstante ello, instancia determinó que el contratista incurrió en una mora de siete (7) meses, equivalentes a 140 días. A base de la pena moratoria estipulada de $50.00 por cada día de atraso, el tribunal determinó que el contratista adeudaba $7,000.00 al demandante-apelante. Mas habiendo éste retenido $10,193.50 del pago final del proyecto, el tribunal determinó que el dueño le adeudaba al contratista $3,193.50.

-A-

Este recurso de apelación fue presentado el 26 de junio de 1995 y se le asignó el número Núm. KLAN-95-00706. En el escrito de apelación se hace referencia a una serie de anejos que no obran en el expediente. El 10 de julio de 1995 San Lorenzo Construction solicitó desestimación de la apelación por motivo de que en la misma se hace referencia a una serie de anejos que no fueron incluidos con el escrito de apelación y no fueron notificados al demandado San Lorenzo Construction.

El 29 de octubre de 1996 emitimos una Resolución en la que ordenamos, entre otras cosas, que el demandante-apelante se expresara en término de 10 días sobre los referidos anejos. El 2 de diciembre de 1996 el demandante compareció en una Moción en Cumplimiento de Orden en la que alegó haber presentado y notificado los anejos a que se hace referencia en el escrito de apelación.

El 13 de diciembre de 1996 volvió San Lorenzo Construction a plantear mediante moción que no se le habían enviado los anejos en cuestión. El 15 de enero de 1997 este Tribunal emitió otra Resolución en la que se ordena al demandante-apelante enviar a los demandados los anejos correspondientes a esta apelación. Al día de hoy los anejos no han sido recibidos por el Tribunal ni se nos ha informado que hayan sido notificados por los demandados.

El Reglamento de este Tribunal ▉ impone a la parte apelante de una sentencia en un caso civil la responsabilidad de preparar un apéndice que debe presentarse en treinta (30) días a partir de la presentación del escrito de apelación. Regla 37 (A) y (B). Dicho apéndice debe contener las alegaciones de las partes, la sentencia de la cual se apela, cualquier otra resolución, orden o escrito de cualquiera de las partes que forme parte de los autos del Tribunal de Primera Instancia y cualquier otro documento que forme parte del récord que sea útil al Tribunal de Circuito de Apelaciones en su resolución de la controversia. Regla 17 (C) (1)-(4). Por su parte, la Regla 36 dispone que en los casos en que conforme al Reglamento se requiera acompañar un apéndice como parte de un escrito, su presentación deberá incluir, entre otras cosas, las páginas numeradas consecutivamente y precedidas por un índice que indique la página donde aparece el documento y copia de todos los documentos que forman parte de los autos en el Tribunal de Primera Instancia.

La Regla 31 (B) y (C) del mismo Reglamento permite al Tribunal desestimar un recurso a solicitud de parte o por iniciativa propia cuando el recurso no ha sido perfeccionado de acuerdo con la ley y cuando no se ha presentado o proseguido con diligencia o de buena fe.

En el caso de autos, el demandante-apelante presentó un recurso que no contenía apéndice alguno ni certificación de la notificación a las otras partes. Tanto el Tribunal como los demandados han requerido en un par de ocasiones los documentos que el demandante cita en apoyo de sus alegaciones. El demandante insiste, por un lado, en que sí envió los anejos que deben formar el apéndice, pero ni siquiera presenta certificación de la notificación en apoyo de su contención. Por otro lado, sugiere que del expediente de apelación surgen los anejos en controversia. Si se refiere a la apelación Núm. KLAN-96-00706, no tiene razón, pues el expediente está desnudo de prueba documental sobre dichas alegaciones. Si se refiere al expediente Núm. KLAN-95-00545, consolidado con el anterior, tampoco tiene razón, ya que el objeto de uno y otro pleito son proyectos distintos, por lo que los anejos de un caso no tienen relación alguna con el otro. La realidad simple es que en el caso de los proyectos Residencial y Comercial el demandante no presentó prueba alguna para sostener sus alegaciones. Aunque el escrito de apelación hace referencia a unos anejos, los mismos no constan en el expediente y, pese a las reiteradas peticiones del demandado y a las órdenes de este Tribunal, el demandante no los ha producido.

En el buen uso de las facultades que el Reglamento citado le concede a este Tribunal, desestimamos la apelación relativa a proyectos Residencial y Comercial por no haberse perfeccionado la misma de acuerdo al Reglamento.

### III

Recapitulando, revocamos la sentencia en el caso Núm. KLAN-95-00545 (Proyecto Industrial) y devolvemos el caso a instancia para que se proceda a determinar la compensación al demandante de forma compatible con lo resuelto en esta sentencia. Desestimamos la apelación del caso Núm. KLAN-95-00706 por no haberse perfeccionado el recurso según requerido por nuestro Reglamento y en desatención a las órdenes del Tribunal.

Así lo acordó y lo manda el Tribunal y lo certifica la Secretaria General. El Juez Gierbolini concurre con el resultado sin opinión escrita.

Aida I. Oquendo Graulau
Secretaria General

### ESCOLIO 97 DTA 109

1. El Reglamento del Tribunal de Circuito de Apelaciones, vigente desde el 24 de enero de 1995, es el que rige en este caso, pues el Reglamento actual entró en vigor el 1 de mayo de 1996, después de radicada la presente apelación.